## COPEMAN LABORATORIES CO. v. GENERAL MOTORS CORPORATION.

### No. C–64.

District Court, E. D. Michigan.
Northern Division.
Jan. 7, 1941.

Cook & Stipes, of Flint, Mich., for plaintiff.

Cooper, Kerr & Dunham, Drury W. Cooper, all of New York City, and Fred E. Jones, of Detroit, Mich., for defendant.

TUTTLE, District Judge.

The plaintiff, Copeman Laboratories Company, on April 22, 1930, entered into a licensing agreement with the Inland Manufacturing Company, which is now a division of the defendant, General Motors Corporation, for the manufacture, use and sale of certain inventions in sharp-freezing containers, grids and devices. Plaintiff claims that application by Hathorne, No. 185,214, dated April 20, 1927, for United States Letters Patent, and United States Letters Patent No. 1,932,731, dated October 31, 1933—issued to Copeman Laboratories Company as assignee upon the foregoing application—and foreign applications and letters patent covering the same invention, were embraced within the licensing agreement. Plaintiff further contends that defendant has manufactured and sold large quantities of devices which come within the scope of said letters patent, foreign and domestic, and has not paid royalty due thereon to which plaintiff claims it is entitled.

The defendant claims: (1) That by the terms of the licensing agreement the Inland Manufacturing Company and its successors had the privilege of electing whether or not the Inland Manufacturing Company or its successors would include in the licensing agreement any patent, which issued subsequent to April 22, 1930, upon an application for a patent which was pending and listed in the agreement;

that Hathorne No. 1,932,731 issued subsequent to April 22, 1930, and that the Inland Manufacturing Company did not elect to include it within the licensing agreement and is therefore not required to pay royalty. (2) That the agreement of April 22, 1930, as modified by a supplemental agreement dated as of November 27, 1934, provided that royalties under the license contract were to be paid only upon nonmetallic containers, grids and devices, and that the articles manufactured and sold by the defendant were metallic and therefore no royalties were required to be paid to the plaintiff. (3) That the sharp-freezing containers, grids and devices which the defendant manufactured did not infringe the claims of Hathorne. (4) That the plaintiff assigned to the defendant Patent No. 1,943,466, to West, dated January 16, 1934, which by its specifications states that a portion of the grids and partitions and a portion of the top member would be coated with a substance to which ice does not readily adhere, and for that reason, namely, because of the assignment and the disclosures contained in the specifications of the West patent, defendant was not required to pay royalties for using inventions under Hathorne. (5) That by the terms of the original instrument of April 22, 1930, plaintiff agreed to prosecute all material infringers of the patents mentioned in the agreement and of patents which might be granted and come under the agreement, and that plaintiff has failed to so prosecute such actions and is therefore barred from the right to recover royalties.

The court finds: That the plaintiff, Copeman Laboratories Company, on April 22, 1930, entered into an agreement with the Inland Manufacturing Company granting the exclusive right to manufacture, use and sell upon a royalty basis the inventions covered by the patents and applications mentioned in the agreement, "and any and all other improvements on sharp-freezing containers, grids and devices made, acquired or controlled by licensor during the life of this agreement; it is understood, however, that licensor will advise licensee of the issuance of each such patent, and that licensee shall thereafter have a reasonable time, not less than three (3) months, to elect as to whether or not it shall be included in this license." The agreement provided for the payment of royalty by defendant "on each device sold and embodying the inventions covered by the above-mentioned patents and applications, or any of them * * *"; and further provided for a sworn monthly report to the plaintiff from the defendant "showing the number of devices sold embodying the invention or inventions as set forth in the above-mentioned patents and applications. * * *" The Inland Manufacturing Company further covenanted to sell as large a total volume of devices "under the patents and applications covered by this agreement as is possible."

To strengthen the position in the industry of the rubber tray being manufactured and sold under the licensing agreement, and to discourage the competition of metal trays then appearing, which was the objective of both parties, in July, 1931, the plaintiff purchased from the Kelvinator Corporation Patent No. 1,688,887, to Spreen, dated October 23, 1928, and Patent No. 1,407,614, to Wicks, dated February 21, 1922. The same covered the use of flexible metal in ice trays. The Inland Manufacturing Company had acquired Vandeventer Application No. 135,496, filed September 15, 1926. By a written instrument of September 4, 1931, the plaintiff and the Inland Manufacturing Company agreed that the Spreen and Wicks patents and all patents or applications for patent covering the use of flexible metal in ice trays, owned or later acquired by Copeman Laboratories Company, would come within the scope of the agreement of April 22, 1930, but modified as to royalty. It was agreed that this royalty be paid should the Inland Manufacturing Company license the manufacture, use and sale of devices under the Spreen or the Wicks patents, or under such patents as might be issued on the Vandeventer application.

On November 1st, 1932, by letter directed to and accepted by the Inland Manufacturing Company, the plaintiff stipulated that grids covered by the agreement of April 22, 1930, could be sold by the Inland Manufacturing Company without trays, at a royalty reduced from six cents for each device to three cents each. The grid is a device which does not of itself hold liquid, but is for use as an insertion into a liquid-containing receptacle for the purpose of dividing into cubes the liquid or substance when frozen. Section II of the license agreement of April 22, 1930, provided for a royalty of six cents on each device sold embodying the inventions covered by the patents and applications or any of them listed in said agreement, up

to the amount of 500,000, and five cents on each such device in excess thereof sold in any one calendar year. This letter of November 1st, 1932, by its clear intent provided that the grids alone could be manufactured and sold at the reduced royalty of three cents each; that the number of such grids so sold could not be taken into consideration in determining when the number of devices sold had reached the 500,000 mark, requiring a reduction from six cents to five cents each, in any one calendar year; and that the same applied only as to the number of trays sold. The grid was one of the inventions listed in the original agreement of April 22, 1930, as Application Serial No. 300,713, which later issued into Patent No. 1,817,544, to Copeman, dated August 4, 1931. Grids stamped with that patent number were manufactured and sold by the Inland Manufacturing Company beginning on or about January 31, 1933, without having been advised by the plaintiff of the issuance of such letters patent.

Application No. 286,837, filed June 20, 1928, was for an invention which related to the use of leveling holes in connection with the sharp-freezing containers, grids and devices, and was listed as an application in the original agreement. On September 27, 1932, Patent No. 1,879,602, to Copeman, issued upon this application. This leveling hole invention was used in the articles manufactured by the Inland Manufacturing Company without having been advised by the plaintiff of the issuance of such letters patent.

The invention disclosed by Application No. 185,214, filed April 20, 1927, was listed as an application for a patent in the original agreement. This is what is referred to as the Hathorne application. Letters Patent No. 1,932,731, to Hathorne, dated October 31, 1933, issued upon said application. The claims in Patent No. 1,932,731, to Hathorne, are as follows:

"1. A receptacle for containing substance to be frozen, said receptacle having side walls, a base and a grid unit, and means permanently associated with said walls and base for preventing the adhesion of the frozen substance thereto and permitting said unit and frozen substance to be ejected when said receptacle is inverted.

"2. In combination, a receptacle for containing substance to be frozen, and means permanently associated with said receptacle for preventing the adhesion of the frozen substance thereto, said means including a mixture containing tung oil.

"3. As a new article of manufacture a sharp freezing container of the type adapted to be positioned in heat exchange relation with the lowside of a mechanical refrigerating system, said container being integral, a partition unit insertable in the container for dividing the container into a plurality of ice cube forming chambers, the interior surfaces of said container and at least a portion of the surfaces of said partition unit being coated with a permanent nonmetallic material containing tung oil to which ice does not readily adhere whereby to permit easy removal of the frozen article or articles.

"4. A receptacle for containing a substance to be frozen, said receptacle having side walls, a base, and compartment defining partitions for dividing the frozen substance into cubes, and means permanently associated with said walls, base, and partitions for preventing the adhesion of the frozen substance thereto, and permitting said frozen substance to be ejected when said receptacle is inverted.

"5. As a new article of manufacture, a sharp freezing container of the type adapted to be positioned in heat exchange relation with the lowside of a mechanical refrigerating system said container being formed of metal and being integral, a grid insertable in said container for dividing same into a plurality of ice cube forming chambers, all the interior surfaces of said container being coated with a smooth relatively hard material permanently associated therewith to prevent the adhesion of the ice to the walls of said container, said smooth material permitting the grid and the formed ice cubes to be ejected when the container is inverted, the surfaces of said grid unit being also coated with said permanent relatively hard material to permit individual ice cubes to be removed therefrom."

Patent No. 1,675,599, to Copeman, issued July 3, 1928, disclosed an ice-freezing container made of rubber. Claims Nos. 8 and 10 of said patent, as issued, related to trays and grids having surfaces formed of permanent nonmetallic material to which ice does not readily adhere, whereby to permit the easy removal of the frozen substance. There was an interference No. 57,210 between the Hathorne Application No. 185,214 and Copeman Patent No. 1,675,599, upon Claims Nos. 8 and 10 of Copeman.

Judgment in the patent office was favorable to Hathorne Application No. 185,214 and terminated on October 27, 1928. Patent No. 1,675,599 to Copeman was thereafter reissued as two patents, Claims 8 and 10 having been eliminated. These reissue patents to Copeman, Number 17,278 dated April 23, 1929, and No. 17,279 dated April 23, 1929, are listed in the original agreement of April 22, 1930, covering inventions therein licensed to the Inland Manufacturing Company.

Canadian Application No. 386,787 for the Hathorne invention, corresponding to United States Application No. 185,214, was filed February 22, 1932; and on April 4, 1933, Canadian Letters Patent No. 331,474 issued thereon. Although Inland Manufacturing Company was given no notice by plaintiff of the issuance of the Hathorne Canadian Letters Patent, nevertheless, on April 25, 1933, the Inland Manufacturing Company granted an exclusive license to the Dominion Rubber Company, Ltd., of Canada, for inventions covered by Canadian Hathorne Application No. 386,787, designating in said licensing agreement to Dominion Rubber Company, Ltd., that said application corresponded to United States Hathorne Application No. 185,214, and further stating that the Inland Manufacturing Company as licensor had exclusive license under said Hathorne Application by virtue of an existing contract dated April 22, 1930, between the Inland Manufacturing Company and the Copeman Laboratories Company.

In the fall of 1933, the defendant tendered to plaintiff a proposed supplemental agreement drawn by defendant's attorneys, pertaining to a division of the original agreement of April 22, 1930, into domestic and foreign licenses. This proposed supplemental agreement listed therein Canadian Patent No. 331,474, to Hathorne, dated April 4, 1933, as corresponding to United States Application No. 185,214 of Hathorne. This proposed supplemental agreement was modified, redrafted and executed by the parties as of February 15, 1934, and therein Canadian Patent No. 331,474, to Hathorne, was listed as corresponding to United States Patent No. 1,932,731, to Hathorne.

In early 1933, a metal ice tray was being promoted by the McCord Company, known as the Tinkham tray. It appeared to Copeman and the Inland that this Tinkham tray infringed the Wicks patent owned by plaintiff. About March 6, 1933, defendant urged that plaintiff file suit for such infringement, and in the same month such suit was filed by plaintiff.

The plaintiff and the Inland Manufacturing Company had from the signing of the original contract of April 22, 1930, worked together fully and harmoniously to promote the maximum sales of the devices in which they were jointly interested, and to combat and discourage competition thereto. In April, 1934, negotiations were begun between the parties for this purpose, which resulted in plaintiff on or about May 5, 1934, proposing in writing to license Inland to make and sell, without charge or royalty, inventions under the Spreen and Wicks patents. In response, by letter of June 4, 1934, the Inland sent to plaintiff for execution a written agreement granting from Copeman to Inland Manufacturing Company, with right to sublicense, an exclusive royalty-free license to make, use and sell devices under the Spreen and Wicks patents, and all patents or applications covering the use of flexible metal in ice trays, owned or later acquired by Copeman Laboratories Company. This proposed agreement was never accepted by plaintiff. A little before this time plaintiff had become interested in Patent No. 1,943,466, to West, dated January 16, 1934, and had paid five hundred dollars on an option to purchase the same.. About June 25, 1934, the plaintiff, having been informed of the defendant's interest in and desire to obtain the West patent, purchased the same, with the understanding that the same was to be assigned to Inland. On November 27, 1934, plaintiff mailed to Inland Manufacturing Company the assignments of the Wicks, Spreen and West patents, with the understanding set out in the accompanying letter that the supplemental agreement of September 4, 1931, relative to devices under the Spreen and Wicks patent and the Vandeventer application, had no further reason for existence, and that it should be canceled.

The Inland Manufacturing Company, after advising with its attorney, had said attorney prepare the supplemental agreement dated as of November 27, 1934. This supplemental agreement was discussed by the attorney for the Inland and the attorneys for the General Motors Corporation; was approved by the latter attorneys; was signed on behalf of the Inland Manufacturing Company by its officers; and was

by letter of February 12, 1935, mailed to the plaintiff herein, together with a check of one thousand dollars, which was the exact amount paid by the plaintiff for the West patent. This check was accepted and deposited by plaintiff in February, 1935. The supplemental agreement in part read as follows:

"Section I. Said prior agreement or writing of September 4, 1931, is hereby canceled and terminated as of November 27, 1934, and is of no effect from that day forth.

"Section II. Said main agreement of April 22, 1930, is hereby modified to the extent that in the future it shall be construed to apply only to non-metallic freezing containers, ice trays, grids and devices which will infringe any claim or claims of any live patent or patents issued or to be issued on applications for patents, both United States and foreign, now owned by said licensor, which patents and applications for patent are listed in said agreement of April 22, 1930."

The foregoing instrument was not signed by the plaintiff until April, 1935. During the negotiations which ended in the execution of the said supplemental agreement as of November 27, 1934, the parties had been discussing flexible metal and metal trays. The Hathorne patent was not mentioned and was not discussed, directly or indirectly, between the Copeman Laboratories Company and the Inland Manufacturing Company, or anyone representing them.

In November, 1934, the Inland Manufacturing Company became interested in the manufacture of ice trays of metal which had thereon a non-metal surface coating to facilitate the removal of ice; and about November 27, 1934, accepted an order for the manufacture of such trays. The Inland Manufacturing Company was also working on the development of somewhat similar devices in their own laboratories. In September, 1936, the Inland Manufacturing Company suggested to plaintiff that the Inland was proposing to license other manufacturers to make metal pans, of the Presto type, for domestic refrigerators, with freedom to use with the pan any grid, metal or rubber; and further, that the Inland proposed to give such pan manufacturers information as to how to wax and anodyze such metal pans, thereby placing thereon a nonmetallic surface coating to facilitate the removal of ice, and requested a reduction of royalty on such pans. The court

finds that in these negotiations of September and October, 1936, the Inland Manufacturing Company was attempting to get a reduction of royalty on those trays of metal upon which there was to be a nonmetallic coating, and that the Inland Manufacturing Company made no claim at that time that the trays when so coated to facilitate the removal of ice were not within the scope of the contract of April 22, 1930, and the Hathorne patent. The plaintiff refused a reduction of royalty to the extent requested by defendant's agents.

The General Motors Corporation, defendant, on or about November 30, 1936, took over all the assets, of every kind and description, of the Inland Manufacturing Company, which was liquidated, and at the same time assumed the liabilities and contracts of the Inland Manufacturing Company. On January 4, 1937, the plaintiff was so advised by the General Motors Corporation, which claimed to be standing in the place and stead of the Inland Manufacturing Company as successor to said company. This notice to the plaintiff, dated January 4, 1937, advised the plaintiff that the General Motors Corporation did not elect to have included in said main agreement of April 22, 1930, and its supplements, Patent No. 1,932,731, to Hathorne, issued October 31, 1933.

This court finds to be established as facts in this case the following admissions of the defendant, namely: That the defendant has made, manufactured and sold large quantities of ice trays, grids and devices with surface treatment of different shape, configuration or arrangement of parts but all represented by defendant's Exhibits II, III and V; that the surfaces of the metal trays and grids in defendant's Exhibits II and III and VI, and the surface of the metal pan in defendant's Exhibit V have been anodyzed and waxed; that the ice-contacting surfaces of the trays and grids in defendant's Exhibits II and III and VI and the metal pan in defendant's Exhibit V, have been treated with a nonmetallic material capable of withstanding repeated separations of ice therefrom; that the principal constituents of this coating material are paraffin and carnauba wax; and further, that such treatment of the surfaces of the metal trays and grids facilitates the removal of ice from the trays and grids so treated.

1. When a contract is open to more than one construction, courts have

and should, for the purpose of putting the correct interpretation upon it, resort to all proper means showing the interpretation intended by the parties. This includes the circumstances under which the contract was made, and the acts of the parties then and since that time in interpreting their own contract. The same language applied to one thing may have a different meaning, and call for a different construction, when applied to another thing. In construing this contract, this court has tried to place itself in the situation occupied by the parties when the agreement was made, and to avail itself of the same light the parties possessed, in order to determine the intent and meaning of the contract. Beginning about April 10, 1930, and more or less continuously thereafter until the contract was executed, on April 22, 1930, the officers, representatives and attorneys of Copeman Laboratories Company and of the Inland Manufacturing Company, discussed, among themselves and with each other, things looking toward agreement. Many patents and applications for patents for ice trays, sharp-freezing containers, grids and kindred devices were then owned by the plaintiff company, which was then engaged in the manufacture and sale of devices under those patents and applications. The plaintiff was then having those articles manufactured by a third party under contract, and was having the same sold on commission under an exclusive sales contract. During the latter part of March, 1930, the Inland Manufacturing Company became interested in the plaintiff's business. The officers of the Inland examined the plaintiff's patents and files containing the applications for patent, and sought to acquire exclusive licenses to manufacture and sell under and to purchase the patents and applications, the material things the plaintiff had for carrying on its business, the sales contract which the plaintiff had executed for the selling of its articles; and in fact, the entire business of the plaintiff corporation, in so far as it concerned or applied to ice trays, sharp-freezing containers, grids and devices, and the patents and patent applications therefor. The court finds that the defendant corporation knew what it was buying; knew what the patents and the applications for patent were; and further, that the defendant was as much interested in procuring license under the applications for patent as it was in procuring license under the patents. This conclusion is reached in part by the fact that the at-

torney for the Inland Manufacturing Company examined not only the patents, but the applications for patents; discussed with representatives of Inland the Patent No. 1,675,599 to Copeman, which had been in Interference No. 57210 in the Patent Office, with the Application of Hathorne No. 185,214, and advised them that in said interference Claims 8 and 10 in Copeman No. 1,675,599 were lost to Hathorne. The Inland was further advised by its attorney that Hathorne Application No. 185,214 would in all probability issue some day, and with still broader claims than then appeared in Copeman No. 1,675,599; and further that the Copeman patents and the pending applications clearly dominated the rubber tray then being developed by Inland.

 When a person representing a corporation is doing a thing which is in connection with and pertinent to that part of the corporation business which he is employed, or authorized or selected to do, then that which is learned or done by that person pursuant thereto is in the knowledge of the corporation. The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing acquire, while acting under and within the scope of their authority.

 When we come to the language of the agreement itself it is to be considered as a whole and to be interpreted within all the four corners. Section 1 of the original agreement of April 22, 1930, reads in part as follows: "Licensor * * * hereby grants licensee an exclusive license to manufacture, use and sell * * * the inventions covered by the above-mentioned patents and applications, and any and all other improvements on the sharp-freezing containers, grids and devices made, acquired or controlled by licensors during the life of this agreement; it is understood, however, that licensor will advise licensee of the issuance of each such patent, and that licensee shall thereafter have a reasonable time, not less than three months, to elect as to whether or not it shall be included in this license."

The court is convinced that there is a chance at least for a legitimate argument claiming that the above paragraph in the contract may be susceptible to more than one meaning. Prior to the agreement of April 22, 1930, the officers of

these two corporations met and made a tentative written agreement. This tentative agreement dated April 10, 1930, was not worded in clear language stating whether or not it covered any inventions and applications for structures which could not be called improvements on inventions already made. It seems plain that the suggestion came from the Inland Manufacturing Company to add the so-called election clause in Section 1 of the agreement of April 22, 1930. This was not included in the tentative written agreement. That is a straw to indicate what the parties intended and how this court should interpret it. There was added to the tentative agreement that part of Section 1 reading as follows: "Any and all other improvements * ˌ * * acquired or controlled by licensor during the life of this agreement; it is understood, however, that licensor will advise licensee of the issuance of each such patent * * *".

It appears that this requirement of advising licensee referred back to its companion, "any and all other improvements", rather than the patents and applications listed; and if any other part of the section was intended to have been modified, and the necessity for advising licensee was intended to apply to patents which later issued upon applications listed in the agreement, it ought to have ᴼbeen made more definite, to clearly indicate that some other reference was intended than to its immediate companion, "any and all other improvements." The court finds that the privilege on the part of the defendant relative to rejecting patents issued subsequent to April 22, 1930, applied only to its nearer neighbor in the English sense, namely, the patents issued on "any and ˌall other improvements acquired by plaintiff subsequent to April 22, 1930."

■ Now in view of the investigation by the defendant of the patents and applications, and its need to have those patents and applications for patent, considering that the defendant was buying and the plaintiff was selling its entire business, and the particular interest shown by the defendant in the Hathorne Application No. 185,214, the court is fully convinced and finds that the parties to the agreement of April 22, 1930, intended to include in the license the Hathorne application, the Hathorne patent when issued, and all other patents issued upon listed applications, without the right to reject. There are many other things in the agreement and its language which all lead to the same conclusion that there was no duty upon ·the part of the plaintiff to advise the defendant about patents issued upon applications for patent which were listed in the agreement of April 22, 1930; and that the defendant had ᴼno right to reject those patents when issued. The court finds that there was no right to reject Patent No. 1,932,731, to Hathorne, and no right to reject Canadian Patent No. 331,474, to Hathorne, and that these are within the licensing agreement; and further, that the right of rejection applied only to patents which might issue on improvements made, acquired or controlled by licensor after April 22, 1930, the date of the licensing agreement.

■ The court finds that on numerous occasions the plaintiff and the defendant construed the licensing agreement of April 22, 1930, in accordance with the interpretation which the court places upon it, and contrary to the interpretation claimed by defendant. Plaintiff has at all times construed it in this manner; and the court finds that the defendant by its conduct has consistently construed the agreement of April 22, 1930, to mean that the right to elect to include under the licensing agreement applied only to those patents issued on improvements made, acquired or controlled by licensor after the agreement of April 22, 1930. The defendant clearly evidenced this to be its understanding in the license which it executed with the Dominion Rubber Company, Limited, of Canada, on April 25, 1933, in which it was stated Inland had an exclusive license under Hathorne Canadian Application No. 386,-787, corresponding to United States Application No. 185,214, of Hathorne. The defendant evidenced the same intention by its acts in including in the proposed agreement in the fall of 1933 for dividing the original license irΠto foreign and domestic licenses, Canadian Patent No. 331,474, of Hathorne, as corresponding to United States Application No. 185,214, and in reciting therein that this patent was among those included in the license which it held from Copeman Laboratories Company. Another such act by the defendant was the execution on February 15, 1934, of the carefully prepared agreement, after it had been redrafted, which divided the original agreement of April 22, 1930, into foreign and domestic licenses, wherein among the patents included in the licenses

was listed Hathorne Canadian Patent No. 331,474, to Hathorne, as corresponding to United States Patent No. 1,932,731, to Hathorne, since it is undisputed that no notice of the issuance of the Hathorne Canadian Patent was given Inland by plaintiff. It is inconceivable to the court that the defendant would have executed a licensing agreement with the Dominion Rubber Company, Ltd., of Canada, for an exclusive license under an application for a patent which had not yet issued, and which patent would issue in a little while, but intended to restrict the license only to the application, and intended that after the patent might issue there would be no license thereunder. The action of the defendant several years later, about November 29th, 1937, after the controversy had arisen between the parties, in modifying the agreement with the Dominion Rubber Company to exclude said patent to Hathorne, was a rather clumsy effort to avoid a most embarrassing and difficult situation, which the defendant must have then recognized. That the Inland Manufacturing Company construed the contract in the same manner as this court now interprets it is further evidenced by the following acts: In the modifying agreement of November 1st, 1932; in the use by defendant of the leveling holes under Patent No. 1,879,602, to Copeman, and in like use of grid Patent No. 1,817,544, to Copeman, without electing, except by such use, to include either of said patents within the licensing agreement, and without having been advised of the issuance of said letters patent or either of them by plaintiff; by the acts of the defendant in September, 1936, in endeavoring to procure a reduction of royalty when it was proposing to license pan manufacturers and explain to them the means and manner of coating the pan with a nonmetallic coating; and in the admission by the defendant in the interrogatories that Canadian Patent No. 331,-474, to Hathorne, is within the licensing agreement. This court can see no substantial difference between the American Hathorne patent and the Canadian Hathorne patent here in dispute. It seems unreasonable to construe the agreement of April 22, 1930, as requiring that the defendant was entitled to be advised of the issuance of the United States Letters Patent No. 1,932,731, to Hathorne, with right to the defendant to elect as to whether or not the same should then be included in the licensing agreement, and not to give the same construction for Canadian Patent No. 331,474.

The court holds that United States Patent No. 1,932,731, to Hathorne, is within the original licensing contract of April 22, 1930, without right of rejection to defendant.

■ 2. The devices which are the subject matter of this cause can be classified as to size, color, configuration, material, function, and in various other manners and ways. So far as the parties were concerned, the devices they wished to promote above all others, and those which they were particularly interested in producing and marketing, were those trays, grids and devices of such construction that the material which came into contact with the ice or frozen substance was nonmetal, of such nature and kind that the ice would not adhere thereto. This was in contradistinction to the other kind of trays, like the old-fashioned all-metal trays, to the surface of which ice so securely fastened itself that it was difficult to remove it. For many years after the original contract was executed the defendant manufactured and sold rubber ice trays and grids; but nevertheless the feature of the tray in which the parties were interested as being valuable in the trade at that time, and the thing that made the money for them, was the fact that the nonmetal surface prevented adhesion of ice. The structures made under Patent No. 1,932,731, to Hathorne, come under the class which had a nonmetal surface preventing the adherence of ice; and this was the class and type of tray and grid which the plaintiff and the defendant were at all times interested in selling, in contradistinction to the metallic tray and grid with the metal surface to which ice did adhere. The defendant knew by virtue of its investigation of the Hathorne Application, before the contract of April 22, 1930, was executed, that the Hathorne Application No. 185,214 had been in interference with Patent No. 1,675,599, to Copeman. It knew from that and from a study of the files that the Hathorne Application was an invention concerning and embracing the use of a nonmetallic coating applied to a metal tray and grid to facilitate the removal of ice and prevent the adherence of ice. It knew that it was of that class and type of invention covered by Claims 8 and 10 of the Copeman Patent No. 1,675,599. Even as early as the 1st of March, 1930,

it had been explained to the defendant by its attorney that in all probability the Hathorne Application would issue some day with yet broader claims than then appeared in the Copeman patents. It knew that the Hathorne tray and grid functioned as a nonmetallic tray and grid, and that it was something different in kind from the metal tray, grid and device.

In the fall of 1934, the defendant began to think about creating a business in trays other than those on which it would have to pay a royalty. Some time in November of that year, it accepted an order from Westinghouse for the manufacture of trays with nonmetallic coating. The efforts of the Inland Manufacturing Company ultimately built up a big business in metal trays with a nonmetallic coating thereon to facilitate the removal of ice; upon which trays they have paid no royalty to plaintiff. It was about this time, namely, November 27, 1934, that plaintiff assigned the Spreen, Wicks and West patents to defendant, and requested cancellation of the arrangement of September 4, 1931. In response to this, the defendant prepared the agreement as of November 27, 1934. This was drawn by the attorneys for defendant, signed by officers of the Inland, and sent to plaintiff in February, 1935. This supplemental agreement eliminated from the original license agreement all grids and trays and devices except "nonmetallic freezing containers, ice trays, grids and devices * * *." This court is convinced that the parties did not understand that they were making a modification of the original agreement by the supplement as of November 27, 1934, which took out of the contract devices made under the Hathorne Patent, namely, grids, trays and devices made of metal, coated with a nonmetallic permanent coating to prevent the adhesion thereto of ice or frozen substance and to facilitate the removal of the same. The language in this modification as of November 27, 1934, is curious in that it does not describe what is taken out of the original contract of April 22, 1930. It is undisputed that Patent No. 1,932,731, to Hathorne,—independent of the claimed right of rejection on the part of the defendant, and for which rejection no attempt had been made prior to November 27, 1934—was in the original license contract at the time this supplemental agreement as of November 27, 1934, was made. The only way to take the Hathorne Patent out of the original contract was by a meeting of the minds of the parties with that intention. It was the sort of thing that if the parties blundered about it and did not remove it, the Hathorne remained in the licensing agreement. It was not that sort of thing, which if they dickered about it together and blundered about it, then it was out; because we start with the Hathorne patent in the original licensing agreement, and there it remains, if you do not put a hook in it to take it out. The attorney for the Inland Manufacturing Company, in his inter-factory letter, gave an interpretation of the agreement as of November 27, 1934. The same conclusion is evidenced by his testimony in this case. The court is led to the same conclusion by the testimony of all the witnesses, all the way through. There are innumerable instances in the testimony which point to this as the only correct interpretation of the classification "nonmetallic" in this instrument dated as of November 27, 1934. The classification the court has found in this opinion is not a new classification made by the court, but is the only one which was made by the words and acts of the parties themselves. It is a construction which is completely borne out and indicated by all the evidence in this case, irrespective of the letter of the Inland attorney. This inter-factory letter, however, construes trays which are coated with nonmetallic coating as not being metal trays, but as being nonmetallic trays in a class with rubber trays. This letter to which the court refers, Exhibit No. 102, dated March 5, 1937, states as follows:

"Our main contract of April 22/30 was modified by the contract of Nov. 27/34 so that said main contract now relates only to non-metallic freezing devices. * * * it was the clear intent of both parties on Nov. 27/34 that Inland was to have free use and control of all patent rights owned by Copeman in so far as the involved patents related to metal ice trays as distinguished from rubber ice trays or trays with nonmetallic surfaces to facilitate removal of the ice cubes."

The court does not believe that the defendant in drawing and executing the supplemental agreement as of November 27, 1934, used the word "nonmetallic" for the purpose of concealing something about the Hathorne Patent and invention or to take advantage of the plaintiff; otherwise the court would think it was a trick put over on the plaintiff. Defendant undoubtedly

understood the agreement as set out in the letter of its attorney, and just as this court has classified the meaning of "nonmetallic" as therein used. In letters to the plaintiff by authorized officers of the Inland in September, 1936, it was recognized that the plaintiff had intended only to modify the original contract in so far as it applied to metal trays, grids and devices, and that the Hathorne invention was not embraced within such metal trays, grids and devices. From all the evidence in this case the court finds that the supplemental agreement as of November 27, 1934, left remaining in the original contract of April 22, 1930, trays, grids, containers and devices with a permanent nonmetallic coating thereon to facilitate the removal of ice.

The court further finds that the original agreement as amended was intended to cover, and does cover and embrace within its terms, requiring the payments of royalty to plaintiff, any and all grids, trays, sharp-freezing containers and devices made of metal having a nonmetal coating thereon which is in contact with the ice under Patent No. 1,932,731, to Hathorne; and that such are, within the meaning of the licensing agreement as amended by this instrument as of November 27, 1934, nonmetallic ice trays, grids, sharp-freezing containers and devices.

The court finds that the letters and agreements and all the evidence tell the same story, which leads to the single conclusion that the court has reached. The court further finds as a fact that if all the conversations were stricken from the testimony, and the relevant exhibits alone were considered, the court would reach the same conclusion as herein stated.

The Hathorne Patent is within the licensing agreement requiring the payment of royalty, and is an invention covering a nonmetallic freezing container, ice tray, grid and device within the meaning of the supplemental agreement as of November 27, 1934.

3. The court has no right or occasion to pass on the validity of this Hathorne patent, and intends to give no hint as to what may be its opinion in that respect. There is a very solemn duty to pass on the question of the claimed infringement. At the time of making the license agreement the defendant knew the status of the Hathorne application and the breadth of the claims which were likely to be allowed. Defendant has not been surprised in that regard.

The specifications of the Hathorne patent describe the old way of doing things in the prior art, in which ice stuck to the metal surfaces which came in contact with the ice. A broad invention is claimed, having a new combination, namely, a tray or device for household refrigeration for freezing ice or frozen substance and making ice cubes, having means permanently associated with the walls and base of the tray or receptacle and upon the surfaces of the grid used therein, to prevent the adhesion of ice thereto and to facilitate the removal of ice therefrom.

Hathorne claimed his invention was new over the prior art. The Patent Office agreed with him, and allowed the claims. Much has been said here about the prior art, and many of the things referred to concerned the use of the old-fashioned way of making ice in large blocks rather than for an apparatus used on a small scale in homes for domestic use. The court has considered the prior art as introduced in the evidence, and has that in mind in determining the meaning and scope of the Hathorne patent. The defendant contends that the claims of the Hathorne patent should be limited so that they apply only when the particular nonmetal coating described in the Hathorne specifications is used.

There are five claims in the Hathorne patent. They are clear and unambiguous. Claims 2 and 3 embrace a coating with reference to a particular mixture containing tung oil. A formula containing tung oil is suggested in the specifications. The court finds that Claims 2 and 3 are not infringed.

Claims 1, 4 and 5 are broad claims. Claim 1 is based upon the combination of a receptacle for containing a substance to be frozen, having side walls, a base and a grid unit, and having means permanently associated with said walls and base for preventing the adhesion of frozen substance thereto and facilitating the removal of the same. Claims 4 and 5 are based upon the combination of a receptacle or container having side walls, base and grid unit with means permanently associated with the walls and base of the receptacle or container and with the surfaces of the grid. Each claim in the Hathorne patent is to be considered as though setting forth a complete invention. The specifications set out a certain formula explaining and describing one of the means

which can be used in combination with the tray, or tray and grid; but in so doing the applicant was not limited to that means alone. Clearly, in the claims and specifications as the court reads them is the broad idea of a nonmetallic coating as a means permanently associated with the interior walls and base of the tray and with the surfaces of the grid used therein, for preventing the adhesion of frozen substance thereto and facilitating its removal therefrom. It is not necessary to describe in these specifications all possible forms in which the claimed principle may be reduced to practice. Such formula expressed as a means in the specifications is not embraced in Claims 1, 4 and 5, and therefore patentee is not confined to that particular mode or formula in the use of his inventions under such claims. It is the claims of the patent and not its specifications which measure the property rights of the patentee. The fact that Claims 2 and 3 are narrower and embrace the use of a mixture of tung oil does not affect the infringement of Claims 1, 4 and 5 which do not contain or suggest any such limitation. These claims are to be given a reasonable construction in the light of the prior art, and are not to be restricted by Claims 2 and 3 or either of them.

A petitioner for patent who has made a broad invention has the duty to disclose by drawings and specifications how the invention may be used operatively. Hathorne claimed to have made a broad invention of a combination of a metallic tray with a permanent nonmetallic coating to which the ice would not adhere. It was his duty to disclose the best coating known to him for that purpose. He disclosed a coating which was operative. By so doing in his specifications and by including the formula for the coating in some of his claims, he did not lose his rights to the broad invention or deprive himself of the right to make broad claims to his broad invention. These broad claims under this license agreement should be interpreted according to their plain meaning as being for the broad invention. To limit Claims 1, 4 and 5 to the particular kind of a coating disclosed in the specifications and set out in the narrower claims would be to make these broad claims exactly like the narrower claims and therefore destroy what Hathorne had shown, claimed and been allowed. It would mean to relieve defendant from paying for what it had used and contracted to pay for. If this court were to follow such a method under the guise of interpreting claims, it would amount to the same thing in substance as passing upon the validity of claims, which the court cannot do under a license agreement where the question of infringement alone is involved. It would amount to a holding by this court that Claims 1, 4 and 5 are void because of the prior art, and that the narrower claims are the only valid claims.

The court finds that the pan or receptacle as exemplified in defendant's Exhibit V is manufactured and sold by defendant for use in connection with a grid; and further that the grid inserted in the pan or receptacle of said exhibit has no surface treatment thereon. The court further finds that the defendant's trays and grids exemplified by Exhibits II, III and VI, and the defendant's pan of Exhibit V have thereon a nonmetallic coating, the same being means which are permanently associated with the sides and base of the receptacles and upon the surfaces of the grids used therewith, and which prevent the adhesion of ice to the surfaces of the grids and receptacles and facilitate the removal of ice therefrom. The court finds that defendant's Exhibits II, III and VI infringe Claims 1, 4 and 5 of Patent No. 1,932,731; further, that Exhibit V infringes Claim 1 of Patent No. 1,932,731; and that defendant's devices as exemplified by defendant's Exhibits II, III, V and VI do likewise come within the scope of and are in the licensing agreement requiring the payment of royalties thereon to the plaintiff by the defendant pursuant to the terms of said licensing agreement.

4. In respect to Patent No. 1,943,466, to West, dated January 16, 1934, the court finds that the assignment from plaintiff to the Inland Manufacturing Company was in reality not a sale. It is true that the plaintiff had paid five hundred ($500) dollars on an option to purchase the West Patent. This was done in furtherance of the common design of the parties to discourage competition of metal trays, and to promote the sale of the devices in which they were interested for their mutual gain. This patent was never commercially used by the defendant. Plaintiff had lost interest in the West Patent but consummated the purchase of it by the payment of an additional five hundred ($500) dollars when the Inland Manufacturing Company requested plaintiff to do so. The West Patent was then assigned by plaintiff to defendant and plain-

tiff was reimbursed for the amount it paid out for the same. It cannot be determined with certainty whether or not there was a principal and agent relationship here, but both of the parties were working together to get this West Patent and did not want their competitors to buy it. In any event, it is undisputed that the Inland Manufacturing Company paid for the West Patent and the defendant got it. The court finds that there is nothing about that to affect this lawsuit or which would bar recovery for royalties. Moreover, if the plaintiff had sold to defendant the West Patent it would not bar plaintiff's action to recover for royalties. If plaintiff owns two patents derived from different sources with different claims, but in the specifications of one patent some mention is made of the invention described in the claim of the other patent, then a conveyance of the one patent does not cover any rights to use the claims of the other patent. The West Patent asserts nothing in its claims pertaining to a coating of the trays, nor of means permanently associated with the tray to prevent the adhesion of the ice thereto and to facilitate the removal of ice. It does not even in its specifications suggest means associated with the tray. It makes in its specifications only the suggestion that surfaces of the grids and the portion of the top member, which is the covering for the tray or grid, could be coated. This might be a temporary coating, like grease. The court finds that the West Patent was never considered by anyone as a part of or having even remote connection with the licensing agreement; but it was always considered as something separate and disassociated therefrom. This defense has no merit.

 5. The court is not impressed with the defense based upon the claimed failure of plaintiff to prosecute all material infringers as a bar to this action. This smacks of a legal defense conceived after the defendant was confronted with a lawsuit. The defendant did not set up this defense in its answer, but denied generally that plaintiff had performed its contract, and further alleged that defendant was without knowledge or information to form a belief as to such performance. The testimony shows that the plaintiff was reluctant to do anything to start a row with the defendant. There is nothing in the evidence to indicate that the defendant said, wrote, or did anything suggesting to the plaintiff that Copeman Laboratories Company was doing or failing to do one single thing contrary to the licensing agreement. There is no proof that plaintiff had knowledge of any alleged infringement of the Hathorne Patent by General Electric Company prior to the filing of this suit. There is no proof that defendant ever requested plaintiff to file any action for such alleged infringement. There was nothing in the evidence which indicated any knowledge on the part of the plaintiff that any trays infringing Hathorne were being manufactured in quantity by anyone; nor was anything done by plaintiff not consistent with that old campaign which both parties had for many years waged jointly against competition, to increase the volume of their own business. The thing the defendant is here complaining about is the failure of plaintiff to sue for infringement of the Hathorne Patent, which patent the defendant is claiming was not embodied in the licensing agreement, and which patent defendant was itself using without paying a royalty. Equity would require the defendant to indicate in some way to plaintiff a desire to have suit for infringement brought against someone before it could successfully claim a defense of this kind.

The court finds that the defendant was not anxious to have plaintiff bring any suit for infringement other than the one which was brought in March, 1933, for the alleged infringement of the Wicks Patent, then owned by plaintiff. The defendant never indicated any desire for any other suits. The plaintiff did nothing and did not fail to do anything which should bar this action.

An interlocutory decree will enter requiring the defendant to account to plaintiff according to the terms of the licensing agreement for devices sold by defendant embodying the inventions covered by the Hathorne patent as herein interpreted; and at the rate of six cents on each such device up to the amount of 500,000 devices sold in any one calendar year, and at the rate of five cents on such devices in excess of 500,000 in any one calendar year.

In determining when the 500,000 devices have been reached in any one calendar year, devices upon which the defendant has heretofore paid royalty in such year shall be taken into account; except that grids sold without trays, and for which the reduced royalty of three cents per grid has been paid, shall not be taken into account.

The defendant shall have credit for such royalties as have been paid plaintiff,

at the reduced royalty of three cents per grid, for rubber grids sold with trays coated according to the patent and requiring the royalty payment.

The defendant shall have credit for the sum of forty-three dollars and eighty-four cents ($43.84) for the year 1939. This is the only sum which the said defendant has heretofore paid to make up the minimum royalty payment.

The amount due and unpaid for each calendar year shall be determined and shall bear interest at the rate of five per cent. per annum. Such interest shall be computed from the 10th day of January following each such calendar year to date of final decree.

Unless the parties are able to agree as to the amount due in the accounting under this opinion, reference will be made to Donald L. Quaife of Detroit, Michigan, as Special Master to make such determination, accounting and report. Such accounting shall cover through the entire period to and including the last business day of the last calendar month preceding the time when the Master begins his accounting. The final decree will carry costs to be taxed against defendant.