COPEMAN LABORATORIES CO. v. NORGE DIVISION OF BORG–WARNER CORPORATION et al. (GENERAL MOTORS CORPORATION, Intervener).

SAME v. GENERAL MOTORS CORPORATION.

Civil Actions Nos. 5601, 5928.

District Court, E. D. Michigan, S. D. July 26, 1947.

Barnes, Kisselle, Laughlin & Raish and Robert A. Choate, all of Detroit, Mich., for plaintiff Copeman Laboratories Co. in No. 5601.

Arthur W. Dickey, of Detroit, Mich., and Harry W. Lindsey, Jr., and George N. Hibben, both of Chicago, Ill., for defendant Norge Div., Borg-Warner Corp.

Arthur W. Dickey, of Detroit, Mich., and Howard Hodgkins, of Chicago, Ill., for defendant Aluminum Goods Mfg. Co.

Harry W. Lindsey and George N. Hibben, both of Chicago, Ill., and Fred E. Jones, of Detroit, Mich., for defendant General Motors Corporation.

Arthur M. Smith, of Dearborn, Mich., for plaintiff Copeman Laboratories Co. in No. 5928.

LEDERLE, District Judge.

Findings of Fact.

1. These actions involve the validity and infringement of all claims of Hathorne Patent 1,932,731, issued October 31, 1933, on an application filed April 20, 1927, and all claims of Kisselle re-issue patent 20,693, issued April 12, 1938, on application filed November 29, 1937, based on Patent 2,025,-290 issued December 24, 1935, on an application filed October 13, 1931. Both patents purport to disclose alleged improvements upon a combination consisting of pans and grids in which a liquid material is frozen into cubes or blocks and intended primarily for use in domestic refrigerators.

2. Plaintiff, which will hereafter be referred to as Copeman, is a Michigan corpo-ration, engaged in the business of development and perfection of inventions, and whose sole income is derived from the sale and license of patents. It has never manufactured ice trays or grids but prior to 1930 it had some of its trays manufactured by others for sale to the trade.

3. Defendant, Norge Division of Borg-Warner Corporation, hereafter referred to as Norge, is an Illinois corporation. The defendant, Aluminum Goods Manufacturing Company, hereinafter referred to as Aluminum, is a New Jersey corporation. The defendant, General Motors Corporation hereinafter referred to as General Motors, is a Delaware corporation. As one of the devices accused in civil action 5601 was furnished to Norge by General Motors, the latter intervened in this action. Norge filed a counterclaim in this action, seeking a declaratory judgment that both patents were invalid, and not infringed, but this counterclaim was withdrawn at the trial by Norge with the consent of Copeman. General Motors took over the defense of Action No. 5601 on behalf of Norge so far as its ice pans and grids are involved. Both patents in suit are closely related, as is the prior art, and, by agreement of the parties, the two actions were consolidated for trial, and duplicate findings of fact and conclusions of law will be filed in each case.

4. General Motors had licenses under the Hathorne patent and its devices are not accused of infringing it. General Motors is charged with the infringement of Claims 1, 2, 4, 11, 12, 14, 17 to 22, inclusive, of the Kisselle patent because of the manufacture and sale of the devices illustrated on Exhibit 40, and in addition, with the infringement of Claims 15 and 16 of this patent because of the manufacture and sale of the Kelvinator structure as shown on that exhibit. Under a release agreement, Copeman and General Motors each released and discharged the other from all claims which each may have had or claimed to have had against the other, growing out of the manufacture, use, or sale, of ice pans and grids prior to July 1, 1941.

5. Aluminum is charged with infringement of all of the claims of the Hathorne patent because of the manufacture and sale

of ice pans and grids set forth in Exhibit 127. Aluminum is also charged with infringement of all of the claims of the Kisselle patent, by reason of the manufacture and sale of the ice pans and grids illustrated on the same exhibit, 127.

6. Norge is charged with infringement of all of the claims in suit of the Hathorne patent because of the use and sale of the devices shown on Exhibit 125. It is also charged with infringement of all the claims of the Kisselle Re-issue patent by reason of its use and sale of the "Tilt-out" pans and grids manufactured by General Motors and Aluminum and sold to Norge, as shown on Exhibits 40, and 151.

7. Kisselle is a well known patent attorney and was patent attorney for Copeman prior to 1930. In April of 1930 Copeman entered into a contract with the Inland Manufacturing Company in which Inland was licensed to manufacture devices covered by its patents in this field. On November 30, 1936, General Motors took over the ice tray manufacturing business of Inland and assumed its liabilities and contracts. A controversy arose between Copeman and General Motors with relation to this contract. In construing this contract, the District Court for this district found:

"To strengthen the position in the industry of the rubber tray being manufactured and sold under the licensing agreement, and to discourage the competition of metal trays then appearing, which was the objective of both parties, in July, 1931, the plaintiff purchased from the Kelvinator Corporation Patent No. 1,688,887, to Spreen, dated October 23, 1928, and Patent No. 1,407,614, to Wicks, dated February 21, 1922. The same covered the use of flexible metal in ice trays. * * *

"The plaintiff and the Inland Manufacturing Company * * * worked together fully and harmoniously to promote the maximum sales of the devices in which they were jointly interested, and to combat and discourage competition thereto." Copeman Laboratories v. General Motors Corporation, D.C., 36 F.Supp. 755, 758.

It was in connection with this suit that the agreement referred to in finding number 4 was entered into in 1931.

8. Copeman authorized its attorney Kisselle, to make a study of the prior patent art relating to ice trays, and ice tray grids and it was while he was engaged in this investigation and study that he conceived of the device disclosed in this patent. At that time Kisselle was well acquainted with the prior art and knew that the use of a combination of a pan and grid for freezing liquids in a domestic refrigerator was common. Thousands of such devices had been manufactured and sold. One of these devices, which had achieved substantial commercial success, is referred to in the record as the McCord "Easy-Out." These devices were made in accordance with the teachings of Weeks Patent 1,738,162 and Cole Patent 2,028,047. The McCord "Easy-Out" devices went into commercial production in June, 1931, and Kisselle was thoroughly familiar with its construction and mode of operation.

9. The pan disclosed in the Kisselle patent is substantially the same as pans used in prior art devices for many years, and is substantially the same as the pan used in connection with the McCord "Easy-Out." The grid of the McCord "Easy-Out" consists of a spring metal pressed into a zigzag or corrugated shape to fit the pan. When the pan of the "Easy-Out" is filled with a liquid and placed in the refrigerator it forms two rows of triangular blocks, one row above the grid and one below. In this respect it functions exactly the same as the Kisselle device as shown in Figure 1 of that patent. It had an overhanging operating handle at each end of the grid, as illustrated in the Cole patent and is shown by reference numeral 7 in Figure 2 of the Kisselle patent. This grid was intentionally made of spring metal and, following the teachings of the Cole Patent, the ends of the lower apices are cut away or notched so as to improve the hinge action which takes place at both lower and upper apices of the McCord grid in operation and makes it possible to move one wall of the grid in relation to the other. The McCord device can be operated and was operated in exactly the same manner that Kisselle teaches the operation of his grids, except that it depends primarily upon the flexibility of the grid to tear the walls

loose from the ice instead of pressure against the inclined planes of the compartment walls as taught by Kisselle. Because of the material from which the McCord grid was manufactured, it was possible to bend or flex it, so that it progressively separated the walls from the ice blocks therein contained. For the reason that only a small portion of the grid was operating to break the adhesion between the ice and the grid at any one time, it could be easily operated by hand without the assistance of a lever or any other devices, and it was possible to remove one ice block without disturbing the remainder.

10. Kisselle sought to improve upon the McCord devices by substituting for the flexible metal hinge, as disclosed in the Weeks and Cole patents, conventional hinges comprising eyes and a pin at either the lower apices of the compartments forming the grid, as shown in Fig. 2 of the patent, or both lower and upper apices, as shown in Fig. 7 of the patent. He thought if he did this he could make the compartment walls of rigid material, which would not become permanently distorted, and thereby secure a grid which would always rest firmly on the bottom of the pan, and thus secure a better thermal contact than that secured by the flexible metal hinge. The gist of his invention is the combination of a conventional hinge with rigid compartment walls. It was his theory that with this construction it is possible to remove the ice cubes by compression between the two walls of the compartments, which form opposed inclined planes. It is obvious that if Kisselle's grid is operated in accordance with the teachings of the patent, that the force of adhesion between the ice and compartment walls, would have to be broken by a sheering action rather than being torn loose in the manner that the McCord device operated.

11. Kisselle was a witness in this case and testified:

"If you use the distortability of the transverse partitions, the actual thinness distortable to release the ice cubes, then it does not come under it. (Kisselle Patent)."

"The teaching of the Kisselle patent is that you don't depend upon the actual dis-

tortability or flexibility of the metal. * * but the essence is that you have such a rigid wall that it shoves the ice cubes up the inclined plane."

"The purpose of the hinge is to allow the use of rigid metal which will keep its shape after repeated use."

"If you get it by flexing something, peeling it away, then it does not infringe, regardless what the claim says."

12. Repeated tests conducted in the presence of the court, demonstrated that if the grid is made in accordance with the teachings of the patent, and Kisselle's analysis of his invention, it is inoperative. Theoretically, it is possible to press the two opposing walls of the compartment together with sufficient pressure to melt ice in part and thus break the bond, but actually it is not possible to exert sufficient force by hand to accomplish this result.

13. No devices, following the teachings of the Kisselle patent, as interpreted by him, have been commercially produced or sold, although licenses have been granted to two manufacturers to use this patent. In one case the licensee paid $25,000 for a fully paid up license, and in another case $10,000 was paid in settlement for alleged past infringement. In view of the extensive market for devices of the type herein involved, these payments merely indicate what the licensees considered to be the nuisance value of the patent.

14. If for some reason a mechanic skilled in the art decided to substitute rigid walls for the flexible walls of McCord, it would be obvious to him that a conventional eye and pin type of hinge could be substituted for the flexible metal hinge. This type of hinge for similar use in the same art is disclosed in Yeager Patent 729,-249, granted May 26, 1905. Those substitutions of the Kisselle type of conventional hinge for the flexible hinge, disclosed in Weeks and Cole, was a step backward in the art. While it is true that after use the McCord grid did not always make a close contact with the pan and it is theoretically possible, if the pan is not distorted, to have the Kisselle grid make a good contact at each of the lower apices, this is of little significance. The alleged improvement of

the Kisselle grid over the "Easy-Out" grid in that it improved heat conductivity is more fanciful than real. Experiments establish conclusively that there is no significant difference between the freezing time of the Kisselle device and "Easy-Out" device. If the Kisselle grid is covered with a rubber coating as taught in his patent, the device would be less efficient than the McCord device as a heat conductor. The defendants have proved that all of the claims of the Kisselle patent are invalid for want of invention and because the devices claimed are inoperative.

15. If it could be said that any of the claims of the patent were valid, they have not been infringed by any of the accused devices. In the accused devices the cross walls are not rigid as taught in the Kisselle patent, but are flexible in accordance with the teachings of the prior art. All of the accused devices depend upon the flexing or distortion of the cross walls to overcome the force of adhesion by peeling the wall away from the ice. In order to operate any of the accused devices, it is necessary to distort the cross-member.

The cross walls of the accused structures do not have a "Bodily Movement" while the ice bond is being broken, as that term is used in the patent. While it is true that the cross walls of the accused structures are so mounted on the longitudinal member that they can be moved bodily when the mixture is not frozen, this kind of movement does not take place when the walls are operated to remove the frozen contents.

The accused structures all omit the hinge, which is the most important element of the combination disclosed in the Kisselle patent. While it is true that in the accused devices the cross-members are attached to a longitudinal member, and with the adoption of the broadest definition possible of a hinge, they could be considered as hinged to that longitudinal member; nevertheless, in none of the accused structures does this connection operate as a hinge for the purpose of ice removal. If these connections are considered as hinges the mode of operation differs radically from the mode of operation of the Kisselle devices. In the accused devices the axis of rotation is vertical; in the Kisselle devices, it is horizontal.

In all of the accused devices the longitudinal member performs two functions; first, it operates as a dividing wall in the ice pan; second, it operates to keep the cross walls separated until the liquid is frozen. In some of the accused devices this longitudinal member is used as a fulcrum for the auxiliary lever that is used to distort the cross-members, and thus tear the cross-member loose from the ice. The latter function bears no relationship to the function performed by Kisselle's hinges. In none of the accused devices does the connection between the longitudinal member and the cross-member function as a fulcrum against which pressure is applied, as in the Kisselle devices.

The surfaces of the accused devices are "treated to form surfaces to which ice does not readily adhere," but none of them follow the teachings of Kisselle as to such treatment. Further this treated surface performs its function independent of the other elements of the combination.

16. In the language of Singer Manufacturing Co. v. Cramer, 192 U.S. 265, 24 S.Ct. 291, 48 L.Ed. 437: There is no substantial identity in the character of the devices, unless, by substantial identity, is meant every combination which produces the same effect.

In this simple, old, and crowded art the Kisselle patent cannot be accorded such a broad construction of its claims. The differences between the accused devices and the devices disclosed in the patent are substantial, and not merely colorable. The accused devices are constructed according to the teachings of the prior art, not the teachings of Kisselle.

17. The Hathorne patent discloses a solution for "ice contacting surfaces of containers, grid assemblies and the like to prevent the adhesion of frozen substances to such surfaces." The solution set forth in the specification of this patent specified tung oil as one of the principal elements of the mixture. The mixture also contains varying quantities of ester gum, toluol, nitrocellulose, butyl acetate, and lindol. It is also suggested that aluminum soap may

be added. Copeman charged infringement of the Hathorne patent without specifying any particular claims, but at the trial Claims 1, 4, and 5 were relied upon. Claim 4, which is typical, reads as follows:

"A receptacle for containing a substance to be frozen, said receptacle having side walls, a base, and compartment defining partitions for dividing the frozen substance into cubes, and means permanently associated with said walls, base, and partitions for preventing the adhesion of the frozen substance thereto, and permitting said frozen substance to be ejected when said receptacle is inverted."

The patent states that when the walls of the container are treated in accordance with the teachings of the patent, the frozen substance may be removed without the necessity of applying heat to the ice containers for the purpose of liberating the frozen mass. The specifications state it is an object of this invention to provide a tray suitable for ice making which permits the removal of the substance frozen therein without the aid of any extraneous means, the only operations necessary being to remove the tray from the machine, invert it, thereby permitting the grid and ice to fall out, whereupon any number of cubes of ice as may be desired can be released from the grid by the exertion of a slight pressure of the finger, the remaining cubes being left intact with the grid, whereby they may be replaced in the tray for future use. Demonstration in open court established that the Hathorne coating would not accomplish the results claimed for it. Surfaces of untreated metal, coated with the Hathorne mixture, showed no appreciable improvement over such surfaces without the Hathorne coating. The surface of anodized aluminum, treated with the Hathorne solution, reduced the adhesion in a slight degree. In order to save Claims 1, 4, and 5, it would be necessary to define the word "means" in those claims to refer specifically to the means set forth in the specification. If this is done, these claims would be substantially the same as Claims 2 and 3, which both include tung oil as an essential element.

18. The file history of the proceedings before the Patent Office during the prosecution of the application resulting in the Hathorne patent discloses that several prior or art patents including the patent to Church 529,346 were cited by the Patent Office, and the claims originally rejected thereon. The prior art patents showed the use of oils and waxes on the surfaces of containers and the like to reduce adhesion of frozen substances thereto. (See Laverty 961,781 and Buckley, 961,839.) These patents were prior art as to Hathorne, and the Hathorne claims were amended and arguments furnished by Hathorne's attorney in the endeavor to distinguish his mixture from the oils and waxes of the prior art.

19. None of the accused devices used the Hathorne coating. They are all coated with a wax mixture on anodized aluminum and follow very closely the teaching of the prior art publication of the British Department of Scientific Research entitled "The Anodic Oxydation of Aluminum and Its Alloys as a Protection Against Corrosion." The material used as a coating on all of the accused devices is a paraffin wax coating which was well known and in use many years prior to Hathorne. None of the accused devices infringe any of the claims of the Hathorne Patent when such claims are properly construed.

## Conclusions of Law.

1. When the validity of a patent is challenged, it becomes the duty of the court to ascertain just what the patentee did, that had not, in essence, been done before, and whether it denoted invention or whether it was not within the routine skill of those laboring in the art. Seiberling Rubber Co. v. I. T. S. Co., 6 Cir., 134 F.2d 871, 873.

2. All of the claims of the Kisselle Re-Issue Patent are invalid because a structure made of rigid cross-members strictly in accordance with its teachings is inoperative.

3. This patent must be considered in the light of the state of the art at the time it was granted and its claims must be considered in the light of its specifications and drawings. Remington Rand, Inc., v.

740

Meilink Steel Safe Co., 6 Cir., 140 F.2d 519, 521.

■ 4. If the claims of the Kisselle patent were construed broadly enough to permit sufficient flexibility so that it would be operative, they are still invalid for the reason that all the patentee did was merely to accomplish an old result by a combination of means which, singly or in similar combination, were disclosed by the prior art, and the patentee has made no advance over the prior art beyond that which would be accomplished by a mechanic skilled in the art. Detrola Radio, etc. Corp. v. Hazeltine Corp., 313 U.S. 259, 61 S.Ct. 948, 85 L.Ed. 1319; Cleveland Punch & Shear Works v. Bliss Co., 6 Cir., 145 F.2d 991.

■ 5. If Claims 1, 4 and 5 of the Hathorne patent were construed broadly enough to cover the devices accused in this action, they are invalid in that they cover subject matter broader than the disclosure of these specifications. Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6; Remington Rand, Inc. v. Meilink Steel Safe Co., 6 Cir., 140 F.2d 519. When a patent is not a generic one, the patentee is entitled to but a narrow range of equivalents. Chicago Forging Co. v. Bade-Cummins Co., 6 Cir., 63 F.2d 928.

■ 6. "There are two tests of equivalency; (1) identity of function, and (2) substantial identity of way of performing that function. Walker on Patents (6th Ed.) 511. Primary as well as secondary patents are infringed by no substitution that do not fully respond to these tests. Even if identity of function were present, the patent not being a primary one, the requirement of substantial identity of way should not be considered so elastic as to condone important differences in manner of operation." Chicago Forging Co. v. Bade-Cummins Co., 6 Cir., 63 F.2d 931.

■ 7. Where, as here, it appears in a patent infringement suit that the accused device follows the teachings of prior art rather than the teachings of plaintiff's patents, that plaintiff's patents are improvement patents covering alleged combinations and the accused structure omits one of the elements claimed in plaintiff's patents, that there is no equivalency because of lack of identity of function and lack of substantial identity of way of performing the functions of the various elements of an accused device, plaintiff has failed to prove infringement.

8. It therefore follows that judgment should be entered dismissing both complaints on the merits for failure of proof of infringement as to all the claims of both patents in suit and because all the claims of Kisselle Re-issue Patent 20,693 are invalid and Claims 1, 4 and 5 of Hathorne patent 1,932,731 are invalid if interpreted so as to include the coating used upon the accused devices.

Judgment for Defendant.

In accordance with the foregoing findings of fact and conclusions of law, it is hereby ordered and adjudged that the complaints in each of these cases be, and each is hereby, dismissed on the merits for the reasons set forth in the foregoing findings.

It is further ordered and adjudged that the defendants may tax costs herein, for which execution may issue.