PEOPLES STATE BANK, Plaintiff,

v.

AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, Defendant.

No. 92–70735.

United States District Court, E.D. Michigan, S.D.

April 13, 1993.

**1074**

Keefe A. Brooks, Richard T. Hewlett, Butzel Long, Detroit, MI, for plaintiff.

James D. Robb, Detroit, MI, Wright, Robinson & McCammon, Washington, DC, for defendant.

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BASED UPON THE BANK'S EARLY DISCOVERY OF THE FRAUDULENT SCHEME AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BASED UPON THE LOAN LOSS EXCEPTION**

GADOLA, District Judge.

Plaintiff filed this action for breach of an insurance contract on February 12, 1992. Following entry of an order extending the time within which to respond to the complaint, defendant filed an answer April 20, 1992. On November 30, 1992, defendant filed two motions for summary judgment; one motion is based upon plaintiff's alleged early discovery of the fraudulent scheme, and the other is based upon a "loan loss exception" allegedly contained in the insurance contract. Plaintiff filed a response to each of these motions December 23, 1992. On January 8, 1993, defendant filed a reply to each

response. Oral argument on these motions was heard by the court March 9, 1993.

**I. Facts**

This action arises out of plaintiff's claim under a fidelity bond for losses incurred as a result of the defalcation of one of plaintiff's long-time employees, Vice President of Installment Loans, Ronald Inda. Inda's scheme involved filling out a loan application and signing to it the name of an unsuspecting or unknown person; signing a promissory note using the (false) applicant's name; and signing a fraudulent UCC–1 form in the applicant's name. A loan file was then established and a loan coupon book issued for each of the fraudulent loans. Inda would then direct the proceeds from these loans either to himself, to the accounts of "others," or to make payment on loans he previously had created. Over a period of several years and perhaps longer,[1] Inda created approximately 623 false loan accounts and embezzled a total of more than $5 million dollars.[2]

Inda would make payments on previous loans with the proceeds from new, fraudulent loans in order to cover up his scheme. In so doing, Inda would issue cashiers' checks and money orders made payable either to the fictitious borrowers or to plaintiff (the bank) and submit these to plaintiff's tellers along with payment coupons for the previous loans. One teller, Geraldine Ezman, began sometime in 1989 or 1990 to notice that the signatures of the payees always looked the same; that is, it appeared that the same person was signing all the checks regardless of to whom the checks were made out. Ezman's Deposition at 21, 24, 26. She also noted that she rarely, if ever, recognized the name of the payee-borrower, even though she had worked for the bank for nearly twenty years and was familiar with many of the customers. *Id.* at 53.

Sometime in 1990, it became apparent to Ezman that the signatures on all the checks were in the handwriting of Ronald Inda. *Id.* at 26. Thereafter, Ezman began taking

1. It is unclear for how long this scheme was perpetrated. Inda worked for plaintiff for more than twenty years.

2. It is unclear to the court, the precise amount of money embezzled by Mr. Inda. In any event, the amount embezzled exceeds the bond's face value $2 million and plaintiff's claim therefore is for the entire $2 million worth of coverage.

notes whenever Inda would bring these suspicious transactions to her teller window. *Id.* at 26. Sometime in 1991, Ezman ran a computer check of the transactions that Inda had been submitting and saw that the borrower names on the loans never matched the payee names on the checks used to make payments on the loans. *Id.* at 34. A month or two later, in May 1991, Ezman told her son-in-law, Jim Kujawski, who is an officer of plaintiff bank, what she had learned and that she suspected Inda "was doing something wrong." *Id.* at 37. Within a month, in June 1991, plaintiff notified defendant of its claim for indemnity as to the money lost as a result of Inda's scheme.

## II. Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citation omitted). The Court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir.1984).

█ The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir.1986). The initial burden on the movant is not as formidable as some decisions have indicated. The moving party need not produce evidence showing the absence of a genuine issue of material fact; rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg,* 801 F.2d at 861.

█ To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted); *see also Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed.R.Civ.P. 50(a). *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.,* 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd,* 929 F.2d 701 (6th Cir.1991). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block,* 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

## III. Analysis

Defendant brings two motions for summary judgment: the first is based upon plaintiff bank's alleged early discovery of the fraudulent scheme; the second is based upon the so-called "loan loss exception" provision of the fidelity bond.

## A. Defendant's Motion Based Upon Early Discovery

■ In its early discovery motion, defendant claims that, by virtue of the knowledge of plaintiff's employee, Geraldine Ezman, plaintiff knew of the scheme either prior to the date the fidelity bond went into effect, or, at the least, more than one month prior to the date on which plaintiff notified defendant of its claim. This claim is premised upon defendant's legal argument that Ezman's knowledge as a teller is legally equivalent to the knowledge of plaintiff as a corporate entity.

In the first instance of alleged early discovery, defendant would not be liable for coverage of plaintiff's losses because the bond was not even in effect at the time plaintiff knew of the fraud. In the second instance, defendant would not be liable for plaintiff's losses because section 5(a) of the fidelity bond provides that notice of the discovery of the loss must be given within 30 days of such discovery. In both cases, however, it must first be established that Ezman's knowledge (whatever that may have been) can, under the law of Michigan, be imputed to the corporation.

■ As a general rule in Michigan, the collective knowledge of employees may be imputed to a corporation. *Smith v. General Motors Corp.*, 192 Mich.App. 652, 656, 481 N.W.2d 819 (1992); *Upjohn v. New Hampshire Ins.*, 438 Mich. 197, 214, 476 N.W.2d 392 (1991); *Gordon Sel–Way, Inc. v. Spence Bros., Inc.*, 177 Mich.App. 116, 124, 440 N.W.2d 907 (1989); *Copeman Lab. Co. v. General Motors Corp.*, 36 F.Supp. 755, 762 (E.D.Mich.1941).

When a person representing a corporation is doing a thing which is in connection with and pertinent to that part of the corporation business which he is employed, or authorized or selected to do, then that which is learned or done by that person pursuant thereto is in the knowledge of the corporation. The knowledge possessed by a corporation about a particular thing is the sum total of all knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing acquire, while acting under and within the scope of their authority.

*Gordon Sel–Way,* 177 Mich.App. at 124, 440 N.W.2d 907, citing *Copeman,* 36 F.Supp. at 762. In this case, it was within the scope of Ezman's employment to verify signatures and to refuse to cash checks she believed to be forged. However, Inda had worked for the bank for approximately thirty-five years and was Vice President in charge of Installment Loans for approximately twenty of those years. Ezman submitted an affidavit wherein she claims that where a bank officer presents to a bank teller a transaction to be processed, the bank teller is no longer the bank employee responsible for clearing the validity of the transaction; in such cases, it is the bank officer's responsibility to verify the propriety and legality of the transaction. See Ex. D to Plaintiff's Response.[3] Thus, the court concludes that Ezman's knowledge is not necessarily imputed to the bank because there is a material issue of fact as to whether investigating the validity of transactions presented to a teller by bank officers was within the scope of Ezman's employment as a bank teller.

■ The court further finds that even if Ezman's knowledge is found to be imputable to the bank, there are genuine issues of material fact as to what Ezman knew and at what point she knew it. Ezman testified that she had strong suspicions that Inda was doing something wrong but that she did not know for a fact that he was guilty of embezzling bank funds until after she notified a bank officer of her suspicions in May 1991. Therefore, for the foregoing reasons, the court will deny defendant's motion for summary judgment based upon the plaintiff bank's alleged early discovery of the fraudulent scheme.

---

**3.** Even if it were Ezman's responsibility to verify the signatures on transactions submitted by a bank officer, Ezman would not necessarily have concluded from the variation in signatures that Inda was involved in wrongdoing. Forgery is not simply the signing of one person's signature by another person. Rather it is the unauthorized signing of another's name for the purpose of defrauding someone of money. *People v. Long,* 27 Mich.App. 385, 386, 183 N.W.2d 641 (1971). Ezman had no reason to know that Inda's endorsement of checks not made out to him was done without the consent of the payee or for the purpose of defrauding someone of money.

## B. Defendant's Motion for Summary Judgment Based Upon the Loan Loss Exception

■ Under the terms of insuring agreement (A) of the fidelity bond, the defendant agreed to indemnify the plaintiff for

Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

(a) to cause the Insured to sustain such loss, and

(b) to obtain financial benefit for the Employee or another person or entity

However, *if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered* unless the Employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500.00.

Exclusion (e) of the fidelity bond at issue in this case provides that the bond does not cover losses:

... resulting directly or indirectly from the *complete or partial non-payment of, or default upon,* any Loan or transaction involving the Insured as a lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such Loan, transaction or extension was procured in good faith or through

trick, artifice, fraud or false pretenses, except when covered under Insuring Agreements (A), (D) or (E).[4]

(Emphasis added).

Defendant makes the somewhat convoluted argument that it should not be liable for coverage of plaintiff's losses because in this case the losses resulted from loans which are excluded from coverage under exclusion (e) of the fidelity bond.[5] A simple reading of the language of exclusion (e) makes it abundantly clear that the losses incurred by plaintiff do not fall under this term of the fidelity bond. Exclusion (e) applies to losses that arise from the "complete or partial non-payment of, or default upon, any Loan or transaction involving the Insured as a lender or borrower, or extension of credit...."

The court finds that Inda's transactions do not constitute loans under the definitions set forth in the bond. The term "loan" is defined by the bond as

... all *extensions of credit* by the Insured and all transactions creating a creditor relationship in favor of the Insured and all transactions by which the Insured assumes an existing creditor relationship.

Found at Section 1(m) of "Definitions," "Conditions of Limitations" of Fidelity Bond. "Credit" is defined at section 1(1) entitled "Letter of Credit."

Letter of Credit means an engagement in writing by a bank or other person *made at the request of a customer* that the bank or other person will honor drafts or other demands for payment upon compliance

---

**4.** Insuring agreement (A) covers the bank for losses resulting from the dishonesty and fraudulent acts of its employees. Insuring agreement (D) covers losses resulting from forged negotiable instruments. Insuring agreement (E) covers losses resulting from forgery in the making of a document which the bank uses as collateral for an extension of credit.

**5.** Basing its argument on the faulty premise that Inda's fraudulent transactions fit the definition of a loan, defendant contends that it is not liable for plaintiff's losses because plaintiff does not contend and could not show that Inda was "in collusion" with any other person, as required by the language of the loan loss exception. Because the court does not find that Inda's transactions fit the definition of loans, the court need not directly address this argument. Nevertheless,

the court does note that there is evidence to suggest and reason would indicate that the loan loss provision of insuring agreement (A) was intended to protect insurers from having to pay for bad loans that were extended after an officer's acceptance of "favors," such as small financial kickbacks, theater tickets or other minimal inducements. Through the loan loss provision, insurers were attempting to limit their liability to situations where the loan officer was getting a substantial benefit for conspiring with a customer to defraud the bank; and to avoid liability where a lending officer was merely induced by small favors to overlook the financial insolvency or other risky characteristics of a borrower. thus, the court finds that the loan loss provision was not intended to except from coverage losses incurred as a result of fraudulent activities such as those in which Inda was engaged.

with the conditions specified in the Letter of Credit.

(Emphasis added). Inda's fraudulent loans were not made "at the request of a customer." Therefore, they do not constitute loans as defined by the fidelity bond and they are not excepted from coverage by the provision of insuring agreement (A) excepting losses resulting from loans.

Even if the court were to find that Inda's fraudulent transactions constituted loans, plaintiff's losses did not arise from "the complete or partial non-payment of, or default upon, any Loan," as required by exclusion (e). Rather, the losses resulted from the fact that Inda was using other fraudulent bank loans to pay previous fraudulent bank loans. Thus, at least to a certain extent, payments on the fraudulent loans were being made; and the bank's losses resulted from the fact that fraudulently procured bank funds were being used to make those payments.

Therefore, for the foregoing reasons, the court will deny defendant's motion for summary judgment based upon the loan loss exception.

### ORDER

Therefore, it is hereby **ORDERED** that defendant's motion for summary judgment based upon the alleged early discovery of the fraudulent scheme is **DENIED.**

It is further **ORDERED** that defendant's motion for summary judgment based upon the loan loss exception is **DENIED.**

**SO ORDERED.**