**FIRST PHILSON BANK, N.A., Appellant,**

**v.**

**HARTFORD FIRE INSURANCE COMPANY, t/a ITT Hartford Insurance Group and ITT Hartford and Thomas L. Keep, Appellees.**

Superior Court of Pennsylvania.

Argued Dec. 8, 1998.

Filed March 10, 1999.

Ronald L. Hicks, Jr., Pittsburgh, for appellant.

Edward Yurcon, Pittsburgh, for Hartford Fire Ins. Co., appellee.

Before HUDOCK, JOYCE, and LALLY–GREEN, JJ.

LALLY–GREEN, J.:

¶ 1 First Philson Bank (Bank), appeals the trial court's grant of summary judgment entered in the Court of Common Pleas of Somerset County. We affirm.

¶ 2 On December 14, 1993, Bank filed a Complaint against Appellees, Hartford Fire Insurance Co. t/a ITT Hartford (Hartford), and Thomas L. Keep (Keep), alleging that Hartford refused to make payment under a fidelity bond that the Bank had maintained with Hartford (Bond). Bank claimed coverage under the bond because of the alleged

misconduct and fraudulent acts committed by the Bank's former employee, Keep.

¶3 Hartford filed a motion for summary judgment. The trial court granted the motion as to counts I, II, and III of the complaint. This order did not dispose of all claims; however, the trial court certified the case for immediate appeal. This appeal followed.

¶4 The trial court set forth the facts as follows:

The transactions at issue involved the floor plan financing system set up between [Bank] and Bergman [Toyota, Inc.]. The facts establish that when Bergman would obtain a vehicle from a location other than the Toyota manufacturer, it would execute a draft on a zero balance checking account it had established with [Bank]. The drafts identified the make, model, year, and VIN number of the vehicle that Bergman was purchasing. The drafts would be made payable to Bergman and would be deposited in Bergman's business account at Cenwest Bank. A copy of the draft was also forwarded to [Bank], which would then place the necessary funds into Bergman's zero balance account and the vehicle would be assigned to Bergman's floor plan by make, model, year, and serial number.

At some point after the floor plan's inception, Bergman began to insert numbers for either existing vehicles that were found at other dealerships or wholly fictitious vehicles on drafts drawn on the zero balance account it held with [Bank]. As stated above, the original draft would then be placed in Bergman's Cenwest business account with copies being forwarded to [Bank]. [Bank] would then place the necessary funds into Bergman's zero balance account. The funds would then be transferred from [Bank] to Bergman's Cenwest account, and [Bank] would add the (fictitious) vehicle to Bergman's floor plan line. Bergman would then issue drafts on its Cenwest account to [Bank] to pay off the fictitious floor planned vehicles. As [Hartford] points out, this payment was not from the sale of vehicles but rather from the funds transferred from Bergman's zero balance account to Bergman's Cenwest ac-

count for a fictitious floor planned vehicle. Essentially, [Bank] was being paid with its own money.

Finally, in August, 1991, [Bank] shut down its computer system for a few days in order to upgrade it. This shut down resulted in a delay in the crediting of the zero balance account in sufficient amounts to cover the checks Bergman had written to cover the purchase of the fictitious vehicles. When [Bank] presented these checks to Cenwest for payment, Cenwest informed [Bank] that the checks were being dishonored on the basis of insufficient funds. Thereafter, [Bank] conducted an investigation and discovered Bergman's scheme.

Trial Court Opinion, 3/11/98, at 2–3.

¶5 After discovering the scheme, Bank called Hartford and advised as to the potential loss of $4,000,000. Hartford later submitted a written proof of loss. For over a year, Hartford neither admitted nor denied the Bank's bond claim. Hartford declined coverage.

¶6 Appellant raises four issues:

I. Whether summary judgment against [Bank] is improper since the $1.9 million check-kiting loss is not a "loan" loss within the meaning of the financial institution bond?

II. Whether summary judgment against [Bank] is improper since there exists sufficient evidence as to [Keep's] receipt of a $2,500 "financial benefit" to raise a genuine issue of material fact?

III. Whether summary judgment against [Bank] is inappropriate since it is both unconscionable and contrary to the parties' intentions under the financial institution bond to require [Bank] to prove actual receipt of a $2,500 financial benefit given the facts and circumstances of this case?

IV. Whether summary judgment against [Bank] as to its bad faith claims was improper?

Bank's Brief at 3.

■ ¶7 Summary judgment is only appropriate when, after examining the record,

there is no genuine issue of material fact and the movant clearly establishes its entitlement as a matter of law. *Skipworth v. Lead Industries Assoc.*, Inc., 547 Pa. 224, 230, 690 A.2d 169, 171 (1997). Moreover, when considering a motion for summary judgment, the court must examine the record in the light most favorable to the nonmoving party, accepting as true all well-pleaded facts and all inferences to be drawn therefrom. *Kingston Coal Co. v. Felton Mining Co., Inc.*, 456 Pa.Super. 270, 690 A.2d 284, 287 (1997). Finally, pursuant to *Nanty–Glo Borough v. American Surety Co.*, 309 Pa. 236, 163 A. 523 (1932), summary judgment may not be entered where the moving party relies exclusively on oral testimony, either through testimonial affidavits or deposition testimony, to establish the absence of a genuine issue of material fact except where the moving party supports the motion by using admissions of the opposing party or the opposing party's own witness. *Porterfield v. Trustees of the Hospital of the University of Pennsylvania*, 441 Pa.Super. 529, 657 A.2d 1293, 1295 (1995).

¶ 8 Bank first argues that summary judgment was improper because the $1.9 million check–kiting loss is not a "loan" loss within the meaning of the Bond. In essence, Bank argues that a loss suffered as a result of the submission, and payment by check, of fraudulent floor plan drafts, is not "a loan" under the Bond. Further, even if the initial $4.8 million[1] loss is deemed to have resulted "directly or indirectly from loans," Bond coverage still existed since the $1.9 million loss did not result from a "loan" but from the advancement of credit on a worthless check. Bank's Brief at 18, 31.

¶ 9 The record reflects that the Bond contains six insuring agreements, the first of which provides for fidelity coverage. Insuring Agreement (A), Exhibit 1 attached to Brief in Support of Motion for Summary Judgment. Insuring Agreement (A) states that Appellee agrees to indemnify Bank for:

[l]oss resulting directly from the dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.

Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent.

(a) to cause the Insured to sustain such loss, and

(b) to obtain financial benefit for the Employee or another person or entity.

However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more of the parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500.

As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

*Id.*

¶ 10 Bank contends that its losses occurred as a result of Keep's fraudulent actions, i.e., "check-kiting scheme" in which both Keep and Bergman were involved. Appellees characterize Bank's losses as loan losses for which coverage is excluded. Therefore, the first issue is whether the trial court erred in concluding that the Bank's losses occurred as a result of a loan.

¶ 11 It appears that no court in Pennsylvania has addressed this precise issue. Bank directs us to, among other cases, *Peoples State Bank v. American Casualty Co. of Reading Pennsylvania*, 818 F.Supp. 1073 (E.D.Mich.1993). In *People's State Bank*, an employee created over 623 false loan ac-

---

1. Specifically, Bank claims that it has sustained an over $4.8 million loss as follows: (1) a check-kiting loss in the amount of $1,986,278.08; and, (2) a floor plan loan loss in the approximate amount of $2,788,218.10, of which about $1.4 million was secured through fictitious automobiles. Plaintiff's Responses to Defendant's Second Set of Interrogatories at 13–14. Following mitigation efforts, the unpaid portion of the total was over $1.9 million and is the amount claimed under the Bond. Rider to Bond, effective 7/15/91, at 1; N.T., 12/23/97, at 28–29; Plaintiff's Response to Defendant's Interrogatories at 7–10; Part 2 of Appendix in Support of Response and Legal Memorandum in Opposition to Defendant's Motion for Summary Judgment at 1–5.

counts by filling out loan applications in the names of unknown or unsuspecting individuals. *Id.* at 1074. With the proceeds from new, fraudulent loans, he would make payments on previous loans. *Id.* The bank finally discovered the fraud after the employee had embezzled over $5,000,000. *Id.* The bank made a claim under a fidelity bond as a result of the employee's fraudulent activity and the insurance company filed suit for breach of an insurance contract. *Id.* The trial court denied the insurer's summary judgment motion stating that the loss was not clearly the result of a bad loan. *Id.* at 1078. The court reasoned that since the bond required that the extension of credit had to be made at the request of a customer and since the loans were not made at the request of a customer, they were not excluded from coverage. *Id.* at 1078. Here, *Peoples State Bank* is distinguished on its facts because the extension of credit was at the request of an actual customer.

¶ 12 Bank next argues that *First National Bank and Trust Company v. Continental Insurance Co.*, 510 F.2d 7 (10th Cir. 1075), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1681, 44 L.Ed.2d 103 (1975), is instructive. There, the bank sought to recover from the insurer (Continental), on a loss it suffered as a result of a business relationship with an automobile dealership. *Id.* at 8–10. The bank and an automobile dealership had an arrangement wherein the dealership would floor plan the purchase of new cars through the bank by borrowing money to pay the manufacturer, Ford Motor Company (Ford), executing promissory notes in favor of the bank and pledging the acquired cars as security for the notes. *Id.* at 9. The bank deposited the loaned amount into the dealership checking account at the bank. *Id.* Ford required a cashier's check at the time of the delivery of the cars. *Id.* Because the dealership was some distance from the bank, the bank authorized the opening of a checking account in the dealership's town to facilitate the obtaining of timely cashier's checks. *Id.* These local bank checks were to identify, by serial number, the vehicles for which the cashier's check was being given. *Id.* When presented with such a check, the local bank would give the dealership a cashier's check in the

amount of the deposit and the original bank guaranteed payment. *Id.*

¶ 13 Soon after this began, the dealership began depositing checks at the local bank drawn on the original bank bearing fictitious Ford vehicle serial numbers. *Id.* No cashier's check would be given in return for this deposit, and the local bank would allow the dealership to draw on the deposited amount immediately. *Id.* at 10. To cover these withdrawals, the dealership would simultaneously deposit a like amount into its account at the original bank in the form of checks drawn on its account at the local bank. *Id.* Like the local bank, the original bank would also allow the dealership to immediately draw upon these deposits. *Id.* After the original bank discovered the scheme, it contacted the dealership which denied any wrongdoing. *Id.* The bank believed it was obligated to cover the dealership's overdrafts to the local bank and did so. *Id.* at 11. The dealership did not repay the loan and later went out of business, and the original bank attempted to recover its losses through a blanket bond issued by Continental. *Id.* The trial court held that since the loss was the result of a check kite, Continental was liable to the bank for its loss. *Id.* at 11.

¶ 14 The Court of Appeals disagreed and held that the loss was the result of a loan. *Id.* at 12. The Court observed that after First National was alerted to the scheme and received an explanation, it immediately loaned the dealership a sum of money and credited its checking account for that amount. *Id.* Thus, the original bank's loss was due not to a check-kite but to the dealership's default on the final loan. *Id.* at 11–12.

¶ 15 Bank also addresses *Calcasieu–Marine National Bank v. American Employers' Insurance Co.*, 533 F.2d 290 (1976). *In Calcasieu–Marine,* the bank sought to recover from the insurer under its bankers' blanket bond for a loss it had incurred through its business relationship with a rice mill. *Id.* at 292–93. When the rice mill would deposit a draft from a purchaser, the bank would immediately credit the mill's account for the amount of the draft before acceptance by that same purchaser. *Id.* at 292. However,

if a rice shipment was damaged, the purchaser would not always honor these drafts when presented for collection, causing the bank to sustain a loss. *Id.* When faced with these losses, the bank claimed that it had been the victim of a check-kiting scheme; however, the insurer denied liability, arguing that the extensions of credit to the rice mill constituted "loans" for the purposes of the bond exclusion. *Id.* at 293.

¶ 16 The Court of Appeals ruled that the extensions of credit were loans and not "check-kites" because: (1) the bank advanced the money to the rice mill upon immediate deposit of the drafts; (2) the bank charged interest on the advances; and (3) in some cases promissory notes were taken with the drafts. *Id.* at 297–98. Finally, the Court noted that the bank knew the considerable risk involved and that it "took such risks in the hope of making a profit on the interest or in obtaining other business advantages" but the "insurers ... did not take those risks and are not to be held accountable when the risks have turned bad[!]" *Id.* at 300.

■ ¶ 17 We turn now to the Bank's case. As the above reflects, a critical factor in each of the above cases is the involvement of the Bank in a lending capacity. The record here supports a conclusion that the Bank's actions involved the extension of credit to an existing customer. The record reflects that: the Insuring Agreements between the Bank and Appellees refers to the floor plan financing system as "loans"; Bank held a security interest in each vehicle in the Bergman floor plan;[2] and Bank unconditionally expected these advances to be paid in full at some future time. Thus, the transactions between Bank and Bergman were "loans" and, therefore, excluded from Bank's Bond coverage.

¶ 18 While Bank urges us to characterize the scheme as an "elaborate check-kiting scheme," Bank's Brief at 30, and while many aspects of the Bergman scheme appear to mimic a check-kiting scheme, Bank is reminded that the transactions in question are, at their very core, loans. Bank's claim fails.

¶ 19 Bank next argues that Keep received a financial benefit with a value of at least $2,500.00 from Bergman. As stated previously, Insuring Agreement (A) contains the following provision:

> if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more of the parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500.

*Id.*

¶ 20 Under Pa.R.C.P. 1035.2(2), summary judgment is warranted:

> [I]f, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2(2). The Note following Rule 1035.2 explains that:

> [u]nder subparagraph (2), the record contains insufficient evidence of facts to make out a prima facie cause of action or defense, and, therefore, there is no issue to be submitted to the jury.... To defeat this motion, the adverse party must come forth with evidence showing the existence of facts essential to the cause of action or defense.

Pa.R.C.P. 1035.2(2), Note.

¶ 21 Bank argues that Keep's receipt of a minimum $2,500.00 financial benefit is evidenced in the following ways: (1) Keep's receipt of a four-door Toyota Camry sedan from Bergman at a low rental rate; (2) Keep's purchase of 100 shares of National Bank of Western Pennsylvania ("NBWP") stock before the merger with Bank; (3) Keep's receipt of in excess of 2,700 shares of Plaintiff's stock through an employee stock option plan (ESOP); (4) Keep's receipt of various salary increases and bonuses from

---

**2.** *See* the Trust Receipts giving the Bank a security interest. Defendant's Brief in Support of Motion for Summary Judgment, Exhibit 4.

Bank; and, finally (5) Keep's extravagant lifestyle, including the purchase of expensive boats, cars and houses. Appellees argue that Bank failed to submit evidence indicating that Keep received a financial benefit of at least $2,500.00 respecting the Bergman scheme.

¶ 22 Following a review of the record, the trial court did not err in concluding that Bank failed to demonstrate that Keep received a financial benefit. Bank first argues that Keep's receipt of a new four-door Toyota Camry sedan from Bergman at a very low rental rate constitutes evidence of his "financial benefit." Bank asserts that Keep was able to obtain the Camry because he and Bergman worked out a deal wherein Keep traded in a "non-existent" Dodge Omni in exchange for the lower rate. However, the record reflects that Keep did possess a 1987 Dodge Omni and that he traded it in when he leased the Camry from Bergman. Therefore, because Keep's Dodge Omni did, in fact, exist, the trial court did not err in concluding that the claim that "non-existent" vehicle is evidence of Keep's financial benefit is without merit.

¶ 23 Bank also argues that evidence of financial benefit is reflected by Keep's purchase of 100 shares of NBWP stock prior to the merger between NBWP and Bank. The record, however, reflects that the explicit terms of the Bond indicate that appreciation of the NBWP stock is not sufficient to show **receipt** of a financial benefit. Further, unrealized gain on a stock purchase and sale does not constitute a financial benefit. *First Dakota National Bank v. St. Paul Fire & Marine Insurance Company*, 2 F.3d 801 (8th Cir.1993). There, the court ruled that where a President arranged for a loan to be made to a company in which he owned stock, the company later defaulted on this loan and the President sold his stock for the same price he had originally paid for it, no financial benefit occurred even though the stock had appreciated while he owned it. *Id.* Here, the record reflects that Keep realized no actual gain and, further, that Keep's stock actually *depreciated* after the bank merger. This claim lacks merit.

¶ 24 Bank next argues that evidence of Keep's financial benefit can be seen through Keep's receipt of in excess of 2,700 shares of Plaintiff's stock through an employee stock option plan (ESOP) and Keep's receipt of various salary increases and bonuses from Plaintiff. The record reflects that Insuring Agreement (A) provides that: a "financial benefit does not include any employee benefits earned in the normal course of employment, including salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions." Bank argues that the provision of Insuring Agreement (A) only excludes coverage for employee benefits or earned in the **normal** course of employment and not as a result of fraudulent acts. Here, the phrase "in the normal course of employment" can be reasonably interpreted to define a type of excluded benefits. *See Auburn–Ford Lincoln Mercury v. Universal Underwriters Insurance Company*, 967 F.Supp. 475 (M.D.Ala.1997). Here, the record reflects that Keep earned his ESOP stock, salary and bonuses in the normal course of his employment. Because these employee benefits are clearly excluded from Bond coverage, Bank's claim lacks merit.

¶ 25 Bank's next argument is that Keep exhibited his receipt of a financial benefit from Bergman through his extravagant lifestyle, including the "purchase of expensive boats, cars and houses." The record, however, fails to reflect evidence to support these allegations and without substantiating evidence to support Bank's claims, the trial court properly refused to accept Bank's allegations. This claim fails.

¶ 26 Bank's next argument is that the $2,500.00 benefit requirement is unconscionable in light of the $1.9 million loss and, therefore, is unenforceable. The trial court did not address this issue. We decline also to address it and note also that the record fails to support a finding of any "financial benefit."

¶ 27 In its final issue, Bank argues that if this Court finds that the trial court erred in determining that Hartford properly denied coverage, then summary judgment as to Appellant's bad faith claims must be reversed as well. Because we have concluded that the

trial court did not err as alleged, this issue lacks merit.

¶ 28 Accordingly, for the foregoing reasons, we affirm the order of the trial court.

¶ 29 Order affirmed.