

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-14-2004

# Hudson United Bank v. Progressive Cslty

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-4224

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

## Recommended Citation

"Hudson United Bank v. Progressive Cslty" (2004). *2004 Decisions.* Paper 231.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/231

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 03-4224

———

HUDSON UNITED BANK,

Appellant

v.

PROGRESSIVE CASUALTY INSURANCE COMPANY

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 00-cv-4135)
District Judge: Honorable Cynthia M. Rufe

———

Argued: October 1, 2004

Before: ROTH and CHERTOFF *Circuit Judges*, and
IRENAS,[*] *Senior District Judge*.

(Filed:   October 14, 2004)

MELVIN R. SHUSTER (Argued)
DEREK B. EDDY
Harry R. Blackburn & Associates
1528 Walnut Street, 9th Floor

———

  [*] Honorable Joseph E. Irenas, Senior United States District Judge for the District of
New Jersey, sitting by designation.

1

Philadelphia, PA 19102

    *Counsel for Appellee*

ANTHONY J. CONSTANTINI (argued)
MATTHEW A. TAYLOR
GREGORY B. LARE
Duane Morris
1650 Market Street
Philadelphia, PA 19103

    *Counsel for Appellant*

————

OPINION

————

CHERTOFF, *Circuit Judge.*

Appellant Hudson United Bank ("Hudson") brings an action against its fidelity insurer, Progressive Casualty Insurance Company ("Progressive"), seeking to recover for losses it sustained in its automobile insurance premium finance ("IPF") business. The claim is based on the Insuring Agreement (A) provision and the Computer Systems Rider provision of the Fidelity Bond. The District Court found that Hudson failed to provide sufficient evidence to survive Progressive's motion for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure on either claim. For the reasons stated below, we will affirm the District Court's decision.

## I.

Because we write only for the parties, we abbreviate our recitation of the facts. In

2

July 1994, Regent National Bank ("Regent"), a New Jersey banking institution, predecessor to Hudson, entered into a profit-sharing agreement with K-C Insurance Premium Finance Company ("K-C"). Pursuant to the agreement, Regent would supply the funding for an automobile IPF loan program, while K-C administered the business in consideration of 50% of the net profits and specified per account service fees.

IPF loans are consumer loans granted to finance premiums for the auto insurance policies of high risk automobile drivers. The insurance premium lender directly pays the automobile insurance company the portion of the premium being financed for the term of the insurance contract. The insured driver then pays the lender a significant down payment and assigns his interest in the unearned premium to the insurance premium lender which serves as a collateral for the loan. If the insured driver defaults on the loan, the insurance premium lender is entitled to recover the unused portion of the annual premium previously payed by notifying the automobile insurance company of the cancellation. By recovering the return premium in conjunction with the pre-default payments and down-payment, the lender often makes more profit on a cancellation then if all the payments were made on a timely basis.

The success of the IPF loan program relied heavily on the creation, installation and operation of a computer software program that would track the IPF loans and promptly react to defaults by cancelling the loans and reclaiming the unearned premium collateral. The key to profitability was speedy recovery of the collateral before it dissipated. The K-

3

C computer software program quickly proved inadequate, however. Most significantly, it was incapable of charging off defaulted loans. K-C's computer system also generated incomplete and inaccurate data that was then supplied to Regent. This prevented timely cancellation of defaulted policies and timely recovery of unused portions of the paid premiums. As a result of K-C's computer problems, Regent allegedly incurred $3,919,430.00 in collateral deterioration and overpaid K-C $889,089.00 based on non-existent profits.

On August 15, 2000, Hudson commenced this action against Progressive in the United States District Court for the Eastern District of Pennsylvania. The original Complaint contained two breach of contract claims against Progressive, based on the Insuring Agreement (A) provision and the Computer Systems Rider provision of the Fidelity Bond. The District Court exercised jurisdiction pursuant to 28 U.S.C. § 1332, based on diversity. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

Our review of a grant of a Rule 50(a) motion is plenary. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993). A Rule 50(a) motion should only be granted if viewing all the evidence in the light most favorable to the party opposing the motion, no jury could decide in the party's favor. Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993).

In granting Progressive its Rule 50(a) motion, the District Court focused primarily

4

on Section 2(e) of the Fidelity Bond which both parties agreed applied to the Computer Systems Rider provision, and on the loan loss exclusionary clause of Insuring Agreement (A). Section 2(e) of the Fidelity Bond precludes coverage for any:

> loss resulting directly or indirectly from the complete or partial nonpayment of, or default upon, any Loan or transaction involving the Insured as a lender or a borrower, or extension of credit, including the purchase, discounting or another acquisition of false or genuine accounts, invoices, notes, agreements, or Evidence of Debt, whether such Loan, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreement (A), (D), or (E).

(App. 532.) Insuring Agreement (A) of the Fidelity Bond, provides indemnification for:

> (A) Loss resulting directly from dishonest or fraudulent acts committed by an Employee with the manifest intent:
> a) to cause the Insured to sustain such loss; and
> b) to obtain financial benefit for the Employee or another person or entity.
>
> However, if some or all of the Insured's loss result directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500.
>
> As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

(App. 428).

The District Court determined that, on the trial record, no reasonable jury could find that Regent's losses were anything other than typical losses resulting from the non-

5

payment of automobile loans, which were excluded under the provisions above.[1] The District Court also determined that Hudson failed to present evidence showing either financial benefit or collusion, the two additional elements required to prove coverage under Insuring Agreement (A) when loss is caused by loans. Based on these determinations, the District Court concluded that Hudson had failed to establish a *prima facie* case under any of its theories of recovery.

We will affirm, but on somewhat different grounds.

A. Insuring Agreement (A)

This circuit has found that in order to satisfy the *prima facie* elements of a claim under Insuring Agreement (A), the insured must prove: (1) that he incurred a loss; (2) that the loss "resulted directly" from dishonest or fraudulent acts of an employee or employees; (3) that the employee committed the acts with the manifest intent to cause the insured to suffer the loss sustained; and (4) that the employee committed the acts with the manifest intent to obtain a financial benefit that is not covered by the exclusionary clause. Resolution Trust Corp. v. Fidelity and Deposit Co. of Maryland, 205 F.3d 615, 636 (3d Cir. 2000). Here, Insuring Agreement (A) excludes from the definition of financial benefit:

---

[1] We note that the exclusionary language in 2(e) is slightly narrower than the language in the exclusionary clause of Insuring Agreement (A) because the former contains the additional qualification that the loss be a result of the non-payment or default on a loan. We need not explain the significance of this difference given the basis on which we are affirming. See infra.

[A]ny employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

So, the financial benefit sought must be other than a type contemplated by the contract of employment. Id. at 645.[2]

Hudson argues that notwithstanding the foregoing exclusionary language, K-C received a financial benefit that was not "earned in the normal course of employment" because it fraudulently induced Regent to overpay K-C non-existent profits and per-contract service fees (i.e., the benefit was the result of fraud). Hudson reasons that First Philson Bank, N.A. v. Hartford Fire Ins. Co., 727 A.2d 584 (Pa. Super. 1999), *appeal denied,* 747 A.3d 901 (1999), stands for the proposition that fraudulently obtained financial benefits do not fall under the financial benefits exclusionary provision since they, by definition, are not "earned in the normal course of employment." Hudson also

---

[2] In Fidelity and Deposit Co., the provision in question was worded slightly differently in that it promised to indemnify the insured for:

(A) Loss resulting directly from dishonest or fraudulent acts of an employee committed alone or in collusion with others. Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent:
a) to cause the Insured to sustain such loss, and
b) to obtain financial benefit for the Employee or for any other person or organization intended by the employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment.

This difference in wording is immaterial.

argues that some financial benefits incurred in this case are also outside the exclusionary provision because they benefited a third party, namely the automobile insurance companies who continued to "earn" premiums on policies that should have been cancelled, and thereby reaped "windfall profits." As a result, Hudson concludes that it has proven the financial benefit element of its Insuring Agreement (A) claim.

First Philson Bank is actually unhelpful to Hudson. There, a Bank sued its fidelity insurer, seeking to recover for losses incurred due to an employee's alleged fraud in connection with a floor plan financing system between the Bank and an automobile dealer. The Bank argued that the employee received a "financial benefit" as defined in Insuring Agreement (A), because he had received, among other things, an excess of 2,700 shares of the Bank's stock through an employee stock option plan and various salary increases and bonuses from the Bank as a result of his fraudulent scheme.

The Superior Court rejected this argument. The court found that these financial gains did not constitute a "financial benefit," despite the Bank's contention that Insuring Agreement (A) did not exclude coverage for employee benefits obtained through fraudulent acts. Turning to the plain language of the provision, the court noted that "[h]ere, the phrase 'in the normal course of employment' can be reasonably interpreted to define a type of excluded benefits." 727 A.2d at 590. The court reasoned that because the record reflected that the stock, salary and bonuses were all of the type earned in the normal course of employment, that they were clearly excluded from Bond coverage even

8

if they were procured through fraud.

First Philson is consonant with our own interpretation of the "financial benefit" requirement. In Resolution Trust Corp. v. Fidelity and Deposit Co. of Maryland, we relied on First Philson, among other cases, to hold that the purpose of the financial benefit exclusion was to ". . .eliminate coverage where the insured's theory is that the employee's purpose in engaging in the misconduct that caused the loss was to receive some type of financial benefit that, generally speaking, the insured provides knowingly to its employees as part of its compensation scheme and as a result of the employment relationship." 205 F.3d at 647. "[I]f the employee committed the fraudulent or dishonest act motivated only by a desire to gain one of the enumerated financial benefits for himself or herself, the insured could not recover under the fidelity provision, as the requirements of [the exclusionary clause] would not be satisfied." Id. at 645.

Hudson's argument that the profits and per-contract service fees earned by K-C were not "earned in the normal course of employment" because they were fraudulently obtained fails under the authority of both Fidelity and Deposit Co. and First Philson.

Similarly, we do not agree with Hudson's argument that the benefits to the third party automobile insurers constituted a financial benefit as defined by Insuring Agreement (A). In order to prove the financial benefit element of the Agreement, it is not enough to show that a financial benefit to third parties occurred. Under the plain language of the provision, a plaintiff must show that the employee acted with the

9

manifest intent to obtain a benefit for an employee or third party that is not covered by the exclusionary clause. Since Hudson points to no evidence in the record that suggests that K-C actually intended to obtain a financial benefit for the third party automobile insurers, there is no issue for a jury on this matter.

Because Hudson has failed to establish a financial benefit to an employee or a third party, its Insuring Agreement (A) breach of contract claim against Progressive must fail. We need not reach the other elements required by this provision, including the District Court's interpretation of the loan loss exclusion.

B. The Computer Systems Rider

The Computer Systems Rider indemnifies the insured for:

> Loss resulting directly from a fraudulent
> 1) entry of Electronic Data or Computer program into, or
> 2) change of Electronic Data or Computer program within any Computer System operated by the Insured, whether owned or leased; or any Computer System identified in the application for this bond; or a Computer System first used by the Insured during the Bond Period, as provided by General Agreement B of this bond; provided that the entry or change causes
> i) Property to be transferred, paid or delivered,
> ii) an account of the Insured, or of its customer, to be added, deleted, debited or credited, or,
> iii) an unauthorized account or a fictitious account to be debited or credited.

(App. 455.) Under the Computer Systems Rider, "fraudulent entry or change" includes entries made by an employee or the insured acting in good faith

> a) on an instruction from a software contractor who has a written agreement with the Insured to design, implement or service programs for a Computer System covered by this Insuring Agreement.

10

Id. (emphasis added).

On appeal, Hudson argues that K-C's allegedly fraudulent actions constitute a fraudulent entry of electronic data into a system operated by Regent or otherwise identified in the application of the bond. Hudson contends that even though K-C did not have access to Regent's Computer System directly, it delivered fraudulent written reports regarding the status of the IPF loans which Regent employees then unsuspectingly input into Regent computers. Because K-C had "software contractor" responsibilities under its contract with Regent, Hudson argues that Regent's actions constituted fraudulent entry within the meaning of the provision. The mere fact that K-C was not a software contractor in relation to Regent's own Computer System, Hudson contends, should not be determinative. We disagree with Hudson's assessment of this claim.

The Computer Systems Rider provides coverage for Computer Systems operated by the insured, identified in the application for the Fidelity Bond or first used by the insured during the bond period. Coverage is contingent on a Computer System that was actually covered causing the loss. The bond application in this case indicates that Regent sought coverage only for its own Computer System. The only outside coverage Regent sought was for the Electronic Data Systems Computer System, a separate entity that processed Regent's loan records. K-C's Computer System is not mentioned anywhere in the application. (App. 419.)

The record shows that the fraudulent data was input directly into the K-C

11

Computer System, not the Regent Computer System. The record also indicates that K-C's Computer System was incapable of electronically transmitting data onto any computer at Regent, that K-C never had access to Regent computers, and that all of K-C's reports were supplied to Regent in hard copy form only.  It is therefore indisputable that the Computer System that caused the loss was owned and operated by K-C.  We reject Hudson's argument that the mere fact that Regent chose to input the data given to it by K-C in hard copy after the fact creates coverage. The Rider only covers entries made on "instruction from a software contractor. . . ." Regent's choice to enter written reports into its own computer does not fit within this language.

Because the K-C Computer System was neither operated by Regent or identified in the bond application, Hudson has failed to make out a *prima facie* case under the Computer Systems Rider. Accordingly, Hudson may not seek coverage under the Computer Systems Rider for fraudulent data that was entered into the K-C Computer System.

## III.

For the foregoing reasons, we will affirm the judgment of the District Court.